EDWARDS, Sheriff of Polk County, *v.* STATE *ex rel.*
KIMBROUGH *et al.*

Opinion filed February 9, 1952.

Rehearing denied June 7, 1952.

LEWIS S. POPE, of Nashville, for appellant.

JOHN C. PRINCE, of Benton, JACKSON C. KRAMER, R. R. KRAMER, KRAMER, DYE, McNABB & GREENWOOD, all of Knoxville, for appellees.

MR. JUSTICE TOMLINSON delivered the opinion of the court.

This is a suit instituted upon the relation of more than ten citizens and freeholders of Polk County for the purpose of procuring a judgment removing John Edwards from his office of Sheriff of Polk County, Code Section 1879. The removal was sought on the ground that he knowingly and wilfully neglected to perform certain important duties enjoined upon him as such Sheriff. The suit was instituted in accordance with the statute carried in the Code under the title of ''Removal of Unfaithful Public Officers''. This statute is commonly known as the

"ouster" law. It is carried in the official code commencing at Code Section 1877.

The Sheriff's demand, seasonably made, for a trial by a jury on the issues of fact made by the pleadings was denied by the Circuit Judge and a trial had upon oral evidence without the intervention of a jury. It seems appropriate at this time to observe that into Section 1889 of the Official Supplement to the Code of 1932 there is expressly written the provision that a defendant official in an ouster case is entitled to a trial by a jury upon any issue of fact. However, this Supplement to the 1932 Code did not become effective until January 1, 1952. The trial in the instant case was had in the summer of 1951.

At the conclusion of the introduction of the testimony which takes up almost eleven hundred pages of the record, the Circuit Judge took the case under advisement for a reasonable while. He then wrote a very able, painstaking and lengthy opinion of sixty pages, wherein his conclusion was that the Sheriff knowingly and wilfully neglected to perform the duty enjoined upon him by the laws of the State in that he knowingly and wilfully failed to exercise his official duty and the power of his office to disperse unlawful assemblies which had prevented the Quarterly County Court of Benton County from meeting on four occasions, commencing with March 2 and ending with April 16. A judgment removing him from office was accordingly entered. The case is now before this Court on the appeal of the defendant Edwards, the Sheriff.

By his assignments of error Sheriff Edwards insists that (1) the Circuit Judge committed reversible error in denying his application made at the beginning of the trial for a trial by a jury upon the issues of fact, and (2) the evidence preponderates against the findings of the Trial Judge that Edwards knowingly and wilfully failed

to exercise his official duties in the respects charged and hereinabove mentioned.

As first enacted, the Ouster Law did not provide for a trial by a jury on issues of fact. By Chapter 94 of the Public Acts of 1933, Section 1889 of the Code was amended so as to grant a defendant official the right to such jury trial. Then Chapter 3 of the Public Acts of 1937, Third Extra Session, expressly repealed, without more, the 1933 Act. This, of course, took away the right of trial by a jury. Then Chapter 10 of the Public Acts of 1939 expressly repealed, without more, the repealing Act of 1937.

It is the contention of Sheriff Edwards that the express repeal by the 1939 Act of the repealing act of 1937 had the legal effect of reviving the 1933 Act which gave a defendant official in an ouster case the right to a jury trial. Stated in the abstract, his proposition of law is that when a statute which expressly repeals another, without more, is itself afterwards repealed, without more, the original statute is thereby revived without any formal words to that effect.

As will be pointed out hereinafter, the provisions of the Ouster Law are such that the materiality of Mr. Edwards' insistence with reference to his right to a trial by a jury depends upon whether there is any conflict in the evidence with respect to the material and determinative issues of fact made by the pleadings. Hence, it is necessary that the evidence in this case be first considered with the view of determining this question:

For some time preceding and during the period of time here involved two political factions existed in Polk County. One was known as the Good Government League; the other, as the regular Democratic Group. The competition

between them was extremely intense and the feeling very bitter.

The Quarterly Court of Polk County consisted of nine members. Five of them belonged to the Democratic Group. The remaining four were associated with, and supported by, the Good Government League. The Chairman Pro Tem was August Lewis. He was a member of the majority group, the Democrats. Sheriff Edwards belonged to the Good Government League, and had been supported in his candidacy for Sheriff by that faction. He and many of the Good Government League crowd were particularly bitter and resentful, politically speaking, of August Lewis, and of his holding the office of Chairman Pro Tem of the Quarterly Court. It is not inappropriate to say at this point that four days prior to the planned fifth meeting of the Quarterly Court in May of 1951 Lewis was ambushed and assassinated. No attempt was made to hold that scheduled meeting, and it is not involved in this suit.

The 1951 Legislature had enacted several Private Acts with reference to Polk County. These acts divested certain county officials belonging to the Good Government League of many of their powers and duties and vested them in the Quarterly Court. One or more offices held by members of the Good Government League were likewise so affected by one or more of these acts as to vest the office in other persons belonging to the Democratic group.

Following the enactment and effective date of these special acts the Quarterly Court of Polk County was called to meet on March 12, 1951. However, as will be more fully hereinafter shown, the five Democratic members of that Court were not allowed to assemble in the Court-House. Efforts to meet on March 24 and April 2 were equally as unsuccessful.

As to the meeting called for April 16, there came to the Democratic members of the Quarterly Court information, which they considered reliable, to the effect that the plan that day of persons supporting the opposing group was to prevent the attendance of two of the Democratic group from the contemplated meeting of the Court, but force the presence of the others. The accomplishment of that alleged plan would have been to create a quorum and, at the same time, to have established a majority representing the Good Government League faction in that particular Court meeting. Based upon that information, the entire Democratic group left Polk County that morning before the alleged plan could be put into effect, if there was such a plan.

On all four of the occasions mentioned large crowds had assembled in the Court-House before the scheduled hour of the meeting of the Court and this crowd, or many of them, remained there for several hours on these occasions. The obvious purpose was to prevent the scheduled meetings of the Court.

When Squire Hammonds, of the Democratic group, started to enter the Court-House for the March 12 meeting, one Edd Bates met him and told him there wouldn't be any Court, and that if he went to the court room it would be "at your own risk". On that occasion Hammonds saw this man Bates present to a man Shearer, who had been appointed Road Commissioner, a paper for Shearer's signature. The paper was the resignation of Shearer as Road Commissioner. Shearer signed it after being told by Bates that he could not assure him as to what the consequences would be if he refused.

Squire Campbell, of the Democratic group, started to enter the Court-House for this contemplated meeting.

He was met at the door by a man named Fred Frase who told him that "there wasn't going to be no County Court that day" and "By God, that means stay out". One Virgil Hicks confirmed the statement of Frase with the statement "Yeah, that means stay out". Squire Campbell said that "from the tone of their voices you could tell they meant what they said". A few minutes later as Clyde Hicks, who was in the crowd, left the Court-House a gun slipped from his pocket. He picked it up and put it back.

As Squire Rogers, of the Democratic group, started to enter the Court-House to attend this scheduled meeting of the Court he was confronted with Frase who told him,—"We are not going to have any Court here today". "Get gone. There ain't going to be no Court here". As a man named Higgins, who was not a Magistrate, started to enter the Court-House on this occasion he was stopped by some one of the crowd that had assembled in the corridors and told that "We are not having any Court today and we are not letting anybody in the Court House; Yes, I mean it, no body is going in here". A companion of this man added,—"That's right. We are not letting any body in".

When the five Democratic Magistrates started up the steps of the Court-House on March 24 to attend the Quarterly Court meeting called for that day, one Ralph Marchant, quite a large man, met them at the door with the statement, first, that there would be no Court that day and that they could not enter. But he then opened the door and said in a loud voice,— "Come right on in, fellows." and then said to August Lewis, the Chairman Pro Tem, "I want you in there anyhow". Thereupon some one in the crowded Court-House corridor said "Be the last damn door you ever go through". In response to Lewis' query as to the whereabouts of the

sheriff, Marchant replied,—"he could be gone on a call" or "he may be gone on a call some where". As these five Magistrates then turned to leave the Court-House some one in the crowd called out "County Court is now adjourned", or "Court is dismissed".

In the jury room of the Court-House on March 24 was a loaded shot gun and a rifle, and there were cartridges on the table. A number of people were in there. These guns were gone the next morning. Defendant's witness, Murphy, was quite emphatic in his testimony, and supports it with what he thinks is documentary evidence, that on the previous meeting attempted to be held on March 12 he saw in this same room one gun in the corner and others on the table with shot gun shells there.

On this March 24 occasion, when an old man named Yates undertook to enter the Court-House he was grabbed by some of the crowd and, after being asked his politics and whether he was armed, he was searched and shoved back out of the door with a command to get out.

On the morning scheduled for the Quarterly Court meeting of April 2 this same Marchant was in the large crowd gathered in the Court-House on that occasion. The doors on the west, east and north entrances to the Court-House were chained with some one of the crowd stationed there who unchained them from time to time to permit entry of some persons.

About mid-night preceding this scheduled meeting Sheriff Edwards made a trip to the home of a brother of one of the Democratic Justices of the Peace for the purpose of procuring certain concessions he had in mind whereby it was the thought of Edwards, Sheriff, that the crowd would permit the Court to meet the next day, as scheduled.

Edwards' suggestion was that some Democratic member of the Court, other than Lewis, be elected Chairman of the Court, and that the five Democratic members agree that they would do nothing in that meeting to disturb the beer commission or the county patrol. On the next day (the date of the Quarterly Court meeting) and after the crowd had assembled in the Court House, Sheriff Edwards went to the store of Lewis at the telephone request of Lewis. This resulted from Edwards' proposition the night before. At that place the nine members of the Court, after much discussion, agreed to the concessions suggested by Edwards. Edwards then said that he would return to the Court-House and ''see if I could determine whether there was any danger or not''. Edwards then addressed the assembled crowd; told them of the agreement. Members of the crowd upbraided him for the meeting at the store of Lewis, and told him that the ''terms were not satisfactory''. The Democratic group made no effort to approach the Court-House, and this meeting of the Court was not had.

On April 16, the date arranged for the next attempt by the Quarterly Court to meet, windows in the witness room and on either side of the Court-House steps on one side of the building had some substance like soap on them whereby the vision from the outside was destroyed. That was the day on which the Democratic members left Polk County because of the information as to what was going to be done to them in order to have a meeting of the Quarterly Court with a quorum present and the Good Government League Justices of the Peace in the majority.

On these occasions the four Justices of the Peace who were members of the Good Government League were

permitted to enter the Court-House, meet, and adjourn the Court for lack of a quorum.

No reasonable being can reach any conclusion other than that the large crowds assembled in the Court-House on the four occasions mentioned were assembled for the purpose of preventing the meeting of the Quarterly Court of Polk County and with full intent to use violence to accomplish their purpose if the Democratic group persisted in an attempt to attend Court on either of those occasions. Thus, this crowd was assembled in the Court-House on each of these occasions for an unlawful purpose, and threatened serious breaches of the peace.

Code Section 11418 provides, in so far as pertinent here, that "the sheriff is the principal conservator of the peace in his county, and it is his duty to suppress all * * * unlawful assemblies, insurrections, or other breaches of the peace, to do which, he may summon to his aid as many of the male inhabitants of the county as he thinks proper."

Sheriff Edwards was in the Court-House on each of the four occasions above detailed. He knew each time of the presence of this large crowd. He could not possibly have escaped knowledge of the intentions of this crowd. Certainly after the first meeting he knew that this crowd had prevented the Quarterly Court from meeting on March 12. Notwithstanding this, he did absolutely nothing to suppress these unlawful assemblies or threatened breaches of the peace. To the contrary, he went nonchalantly about other matters in the Court-House. He did say to the crowd assembled there on April 2, after he had sought to work out the agreement mentioned, that he was going to be ousted if the crowd didn't permit the Court to meet, and that he would have to arrest them if they interfered.

He did nothing else then to suppress this unlawful assembly. Of course, the damage had already been done.

On the morning before the first attempted meeting, the Sheriff did telephone four of his deputies who lived some thirty miles away to come over to the meeting of the Quarterly Court for the purpose of preventing violence. He did not instruct them to suppress this unlawful assembly or to prevent the crowd from interfering with the efforts of the Justices of the Peace to attend Court. These deputies, on each of these occasions, did come over the mountain to Benton but they made no move whatsoever to prevent this unlawful conduct or to restrain the crowd, or to assist the democratic Justices of the Peace. None of these deputies was ever in the the Court-House or around that part of it at the times the crowd on these occasions by threats of violence prevented the Justices of the Peace belonging to the Democratic faction from attending the contemplated meetings of the Court. Nor, after the first unsuccessful attempt to meet, did the Sheriff give any of these deputies any instruction to thereafter conduct themselves differently or suppress any further gathering of such assemblies at the subsequent meetings upon which it was attempted to have sessions of the Court.

The above stated uncontradicted evidence establishes without reasonable dispute the fact that Sheriff Edwards neglected to perform the duty enjoined upon him by Code Section 11418 to suppress unlawful assemblies and prevent breaches of the peace. So, the next question is whether the material and determinative uncontradicted evidence forces all reasonable men to conclude that he neglected these important duties knowingly and wilfully, and thereby subjected himself to ouster under the mandate of Code Section 1877.

On March 12, the date the Quarterly Court was to first meet, Sheriff Edwards permitted his Chief Deputy and the regular deputy who lived close to Benton to be out of town on that day. They were out of Benton, they say, to perform official duties, which the record shows beyond doubt were not pressing or immediately imperative. On that morning the Sheriff had four special deputies across the mountain thirty miles away to come over in order, he says, to prevent violence that might occur in connection with the contemplated meeting of the Quarterly Court. He says that he did this because he had seen the crowd gathering. He thereby demonstrated an anticipation that some violence might occur in connection with that meeting. He gave these deputies no instructions to disperse this crowd.

Time and again in this record there is reflected by absolutely necessary inference the fact that many people who were in Benton on the mornings of March 12 and March 24 were anticipating that the crowd at the Court-House, or a number of them, intended to prevent by force and violence, if necessary, the entry of the Democratic Group of the Justices of the Peace into the Court-House for the Court meeting on those respective dates. Several witnesses introduced by defendant testify that as this Democratic Group of the Justices of the Peace started to the Court-House, they, the witnesses, stood in front of stores or upon the sidewalk or followed behind and watched these Justices of the Peace as they approached the Court-House door. Perhaps the expectation of the crowd is accurately pictured by the testimony of Sheriff Edwards' witness named Lowe who testified without contradiction that "there was quite a crowd there watching to see what would happen when they came to the Court House."

█ It will not do for the Sheriff to say that he was unaware of all this. He is, as to his duty,

"derelict if he shuts his eyes to what is generally known in the community, or purposely avoids information, easily acquired, which will make it his duty to act." *State ex rel. Thompson v. Reichman,* 135 Tenn. 685, 693, 188 S. W. 597, 599.

Neither the Sheriff nor any of his deputies were present at or near this door of the Court-House on these occasions as this Democratic Group of Magistrates approached it and for for some time, before turning back, stood at that door while they were threatened, intimidated, over-awed and given distinctly to understand the violence that would follow if they dared to enter that Court-House.

These deputies, so the Sheriff testifies, were brought from over the mountain thirty miles away to prevent "violence" in connection with the anticipated meeting of the Quarterly Court. They were in Benton, *but not in the Court-House,* when the Democratic group attempted to enter on March 12 to attend the scheduled meeting of the Court. These deputies, and the Sheriff, knew that the crowd in the Court-House had prevented their entry on that occasion. These deputies returned for the same purpose, it is said, upon the occasion of the scheduled meeting of March 24.

The testimony of Deputy Wright is that he and one other deputy were sitting in their car on one side of the Court-House at the time the Democratic Group again approached the Court-House from the other side and were turned back in the same manner by the crowd therein assembled. Another of their group who had come from over the mountain to prevent violence in connection with the meeting of the Quarterly Court was, so Wright

says, at a "soda shop" or "sandwich shop" at the time. Another, the chief deputy, says that he was absent from the Court-House at the crucial time in question for the purpose of seeing about a forfeiture that somebody feared might thereafter be taken on some bond which that somebody had signed. But no deputy, at the crucial time, was in the Court-House on the occasion where the previous violence had taken place on the previous occasion. Notwithstanding the Sheriff's knowledge of that which happened on March 12 he gave his deputies no instructions to be in the Court-House for the protection of these Magistrates as they attempted to enter for the scheduled meeting of March 24.

After the mob in the Court-House had turned back the Democratic Group of Magistrates on March 24, as that group attempted to enter, "somebody", according to the testimony of deputy Wright, came up close to this car in which Wright and one of his associates were sitting on the opposite side of the Court-House and "they was talking and I just asked them, I said 'What happened? Did Court meet?'" The Court was supposed to meet, and Wright knew that. He was in Benton because of that fact, he says. In the light of that fact, there is no reasonable explanation in this record of this unusual inquiry other than that he had anticipated that something would occur that might prevent the meeting of this Court. Yet he and his associates, who had come from over the mountain to prevent violence in connection with the meeting of the Court, were conducting themselves in a manner entirely inconsistent with the preventing of violence at the very place and time they necessarily knew it would probably take place in connection with an attempted meeting of the Court.

The Sheriff's testimony reflects it to be a fact beyond doubt that he knew what his duties were within the premises. He testifies that in his talk to the crowd in the Court House on April 2 he said to them,—"It wouldn't do to molest them (the Democratic members of the Court)— if I didn't open the way for them to meet that I would be subject to be ousted and that I was going down to get them and not to molest them". So it stands an undisputed fact that the Sheriff knew and understood his duties in the situation. He did nothing to prevent their being molested on March 12, though he had demonstrated by the act on the early morning of that day that he expected violence in connection with the meeting of the Court. He did nothing to prevent them from being molested on March 24, though he had been informed of the conduct of this crowd on March 12 when it had turned these Magistrates back when they approached the Court-House door for the scheduled meeting. He did nothing "to open the way for them to meet", though he knew, as established by his own statement, that this was his duty in the situation that existed.

On the March 24 occasion, the Sheriff left his own office about the time the members of the Court would be expected to enter the Court House for the purpose of attending the meeting and went to an office in a distant corner of the Court House to attend, he says, to what was a relatively unimportant matter. He says that he went also to the other part of the Court House so that he might look over toward the Benton Bank to discover any violence which might be going on over there. This, in effect, is an admission by the Sheriff that he was expecting violence that day in connection with any attempt to have the scheduled meeting of the Quarterly Court. He made no investigation as to the large crowd in the Court House

corridors and rooms where he then knew the previous violence of the crowd had taken place, or as to what was going on in there.

Sheriff Edwards admits that after he returned to his own office in the Court-House on the occasion just mentioned he was informed that the crowd in the Court-House had turned these Democratic Justices of the Peace back from the Court-House. He admits being informed that this man Marchant was one of that group. He admits that he made no investigation and did nothing then to suppress this gathering to the end that the Quarterly Court might meet, though only about three minutes, according to his own statement, had transpired after the happening of this event.

After the happening of this event, he did nothing to prevent the recurrence of the same unlawful conduct at the next attempted meeting of the Court other than to say to the assembled mob on that occasion that he was subject to ouster if he did not see to it that the crowd did not prevent the Court from meeting. In this connection, he makes this very significant statement, to wit:—"*We* are going to have to let the Court meet." (Emphasis supplied.) It was on this occasion, too, that he left the Magistrate Lewis' store with the statement that he would go over and ascertain "whether there was any danger or not". He had done nothing previously to so ascertain, in spite of all the information that had come to him.

Edwards admits that subsequent to the first attempted meeting, and prior to the second attempted meeting, he was informed of ten conditions drawn into a resolution or some paper of that nature that would have to be met before the framers of that resolution and their followers *would permit* a meeting of the Quarterly Court. He also admits that prior to this second meeting he knew of an

injunction suit to prevent future interference with future intended meetings of the Court by members of the organization to which he belonged. He admits that he went to a meeting of the Good Government League which was quite largely attended on the night of March 13. He attended another meeting of this faction on the night of March 23. He says it was for the purpose of serving that injunction. He admits that on one of these occasions he heard one of the leaders of that group (Frank Lowery, he thinks) make a speech to that large crowd and heard him say to this crowd:

"Keep the flame of liberty burning in your hearts and use every ounce of strength from your bodies to keep anyone from snuffing it out."

With all this information, neither he nor his deputies did anything to suppress the large crowd that assembled in the Court House on each of the subsequent occasions for the purpose of preventing by violence, if necessary, the Court from meeting.

Sheriff Edwards admits that he was informed of the presence of guns in one of the rooms of the Court-House on the occasion of the second attempt to meet, being so informed after the attempt to meet had failed, and knew of the disappearance of these guns by the next morning. This meant to any person of intelligence an intent to do violence, of course. He admits that during the period of time involved in this case that "people from all over the country cut out clippings and mailed them in" with reference to this affair. Yet, in spite of all this information, he did nothing to suppress the unlawful assemblies at the future scheduled meetings or to prevent physical violence to those Democratic members of the Quarterly Court who might attempt to attend these future meetings. He admits that the five Demo-

cratic members gave him a written communication stating that they had been subjected to the treatment above detailed at previous attempted meetings, and that this communication was a request that he take such steps as were necessary to assure their safety at the next scheduled meeting. He admits that he did nothing about it more than to again have these same deputies *in town*. He says he considered their request unreasonable in that they wanted him to see them safely from their homes to the Court-House and back again.

■ ■ The hereinabove review of the uncontradicted material evidence in this case establishes it to be a fact, without the possibility of reasonably reaching a contrary conclusion, that (1) (a) the crowd assembled in the Court House on each of the four occasions mentioned was assembled there for the unlawful purpose of preventing scheduled meetings of the Quarterly Court of Polk County, and (b) intended to use, and did use, violence and threats of violence to accomplish its unlawful purpose, and (2) Sheriff Edwards, in the exercise of the activity and diligence required of him by law should have known of this unlawful assembly and of its intention to breach the peace to accomplish its unlawful purpose, and (3) Sheriff Edwards did know that this crowd had assembled for an unlawful purpose, and that it intended to use and did use violence and threats of violence in the accomplishment of its unlawful purpose, and (4) neither Sheriff Edwards nor his deputies did anything to suppress this assembly gathered in the Court House on each of these occasions for the unlawful purpose mentioned, nor anything to prevent in the Court House, where this crowd was assembled, the violence and threats of violence employed by this mob for the acomplishment of its unlawful purpose.

As aforesaid, it is affirmatively provided by Code Section 11418 that the Sheriff's duty is

"to suppress all affrays, riots, routs, unlawful assemblies, insurrections, or other breaches of the peace, to do which he may summon to his aid as many of the male inhabitants of the county as he thinks proper."

In as much as there is no conflict in the material, determinative evidence, and since the only reasonable conclusion which can be reached from that evidence is that Sheriff Edwards knowingly and willfully violated the above stated statutory duty enjoined upon him, it now becomes necessary to determine whether Mr. Edwards' insistence with reference to his alleged right to a trial by a jury upon these issues of fact is an insistence which can effect the conclusion to be reached as to the merits of this appeal. If not, a decision of this insistence is unnecessary and, in accordance with the well-established practice, should be pretermitted.

It is provided by Code Section 1888 that proceedings under the Ouster Law "shall be conducted in accordance with the procedure of courts of chancery" and that the Courts trying the cause are "given the full jurisdiction and powers of courts of equity with respect to such proceedings."

Perhaps as clear a statement as may be found in the published opinions of our Courts as to the rule of procedure and practice of chancery with reference to jury trials is that stated in *Lincoln County Bank* v. *Maddox,* 21 Tenn. App. 648, 114 S. W. (2d) 821. Petition for certiorari was denied in the case. The rule is stated in that opinion as follows:

"It is the established practice in chancery cases where the proof is heard by a jury demanded by one

or more of the parties, and the chancellor rules that there is no conflict in the evidence with respect to the material and determinative issues of fact made by the pleadings, and thereupon withdraws the case from the jury, it is his right and duty to render a decree in accordance with the law applicable to the undisputed evidence in the record. Among the cases which clearly recognize the propriety of such procedure are the following:''. (Citing cases), 21 Tenn. App. at pages 656-657, 114 S. W. (2d) at page 826.

Had the Trial Judge granted Edwards' application made at the beginning of the hearing for a jury to determine the issues of fact, nevertheless, in accordance with the immediately stated rule it would have been his duty to withdraw this case from the jury at the close of the evidence and enter the judgment which he did enter. Therefore, if it was error, and we do not so decide, for the Trial Judge to deny Edwards' application made at the beginning of the hearing for a jury it was harmless error. This Court is not permitted to reverse for harmless error. Code Section 10654.

Let the judgment be affirmed with costs of appeal adjudged against Edwards and his sureties.

## On Petition to Rehear

The Court's heretofore rendered opinion in this cause is that the evidence reviewed in that opinion is not contradicted, and is without conflict, and that the only reasonable conclusion which can be reached from that evidence is that Sheriff Edwards knowingly and wilfully violated those official statutory duties mentioned in the opinion. Mr. Edwards has filed a petition to rehear. One insistence therein made is that the Court was mistaken in this conclusion.

Included within the great volume of evidence submitted on the trial of this case is considerable evidence that certain events occurred. Mr. Edwards countered with the submission of considerable evidence that those certain alleged events did not occur. By way of illustration, the relators offered such evidence that on more than one of the occasions when the Quarterly Court sought to meet, there were guns sticking out of the courthouse windows and pointed towards the approaching democratic group of magistrates. Mr. Edwards offered considerable evidence that this did not happen.

In support of the aforesaid insistence made in Mr. Edwards' petition to rehear there is discussion of the evidence as to the happening or not happening of those alleged events, such as that of the guns sticking out of the courthouse windows. Based upon this discussion in the petition to rehear, the contention there made is that the Court was in error in determining that uncontradicted evidence forced the conclusion that Mr. Edwards knowingly and wilfully violated the law in the respects mentioned in the opinion.

Attention is called to the fact that none of these events as to the happening or not happening of which there is conflicting evidence is discussed in this Court's opinion. That opinion only discussed evidence as to which there was no contradiction or conflict. The only reasonable conclusion that could be reached from that evidence, in the Court's opinion was, and is, that Mr. Edwards knowingly and wilfully violated his official statutory duties in the respects mentioned without regard to whether there did happen or not happen the events as to which there was conflicting evidence. In fact much of the evidence mentioned in the Court's opinion is that testified

to by Mr. Edwards himself on cross-examination, or by his witnesses.

Stated in the language of the quite able and earnest petition to rehear, the next insistence made is this:

"When an application for a jury was denied, then, there was only left to the trial court two ways by which the case could be tried according to chancery procedure on oral testimony; (1) upon a written agreement signed by all of the parties to the suit or their attorneys consenting to try the case upon oral testimony, and (2) upon application of some party to the suit to the court to try the case on oral testimony and upon proper showing being made an order entered by the court directing that the case be heard on oral testimony. No written agreement or consent to try the case on oral testimony was filed. No application was made by either party to try the case on oral testimony and no order was entered by the court directing that the case be heard on oral testimony. Therefore, the court had no jurisdiction to hear it on oral testimony, and therefore, the trial and the judgment entered by the lower court was absolutely void, because it was not a legal trial as expressly provided by statute.

"Therefore, the defendant insists that this case should be reheard and reversed and sent back to the trial court for a proper and legal trial of this defendant." (Pages 5-6 of Petition to Rehear)

The insistence just stated inadvertently fails to take into account that this is a trial under the ouster act, and that the ouster act is sui generis. It provides the procedure to be followed in a trial under that act, as is pointed out in the Court's opinion.

The insistence just stated likewise overlooks the decision of this Court in *State ex rel. Timothy* v. *House,* 134 Tenn. 67, 183 S. W. 510, L. R. A. 1916D, 1090. That decision directly and expressly holds exactly the contrary of the aforestated insistence of the petition to rehear. That holding appears on pages 85-86 of 134 Tenn., on page 515 of 183 S. W. of the opinion, and is as follows:

"The appellant in the lower court at a timely stage objected to the introduction of oral evidence, on the ground that the proceeding is provided to be conducted 'in accordance with the procedure of courts of chancery, where not otherwise not expressly provided herein,' and that the Code, Shannon, Section 6272, stipulates that in chancery cases testimony shall be taken in writing. We are of opinion, in view of the fact that the proceeding is summary, that oral proof was properly admitted. To have taken the proof in the form of depositions under the rules of chancery procedure, allowing four months for proof in chief and two months for proof in rebuttal, would have frustrated the purpose of the act which looked to expedition.

"The purpose of the Act was to advance the remedy, and in such case the construction to be given it should be liberal to the same end."

In the Court's opinion it was concluded that since there was no conflict in controlling evidence mentioned in the opinion with respect to the determinative question of whether Mr. Edwards knowingly and wilfully violated his official duties in the respects mentioned that:

"Therefore, if it was error, and we do not so decide, for the Trial Judge to deny Edwards' application made at the beginning of the hearing for a jury

it was harmless error. This Court is not permitted to reverse for harmless error. Code Section 10654.''

The final insistence of the petition to rehear is that this action upon the part of the Court is precedent breaking and if ''allowed to stand that it destroys the right of trial by a jury in this State''.

In making this insistence counsel probably had in mind those cases in which a trial by a jury is guaranteed by the Constitution, and must have overlooked the fact that this guarantee does not apply to trials had in accordance with procedure of courts of chancery, and apparently he inadvertently failed to take into consideration that the ouster act expressly provides that proceedings thereunder shall be ''in accordance with the procedure of courts of chancery,'' and that the trial judge is ''given the full jurisdiction and powers of courts of equity with respect to such proceedings.'' Code Section 1888.

The author of the petition to rehear, in concluding that the action of the Court was precedent shattering, apparently overlooked *Burns* v. *City of Nashville,* 142 Tenn. 541, 221 S. W. 828. In that case identically the same action was taken as that taken in the instant case in an identical situation. There on page 616 of 142 Tenn., on page 850 of 221 S. W. the Court said and held as follows:

''Here it may be further said, on the action of the chancellor in refusing said defendant's application for a jury, that evidence was offered by the complainants which showed liability on the part of said defendant, and it offered no countervailing evidence to rebut that offered by the complainants, and the record does not disclose that it had any evidence that it could offer.

"We are of the opinion, therefore, that the chancellor's action, even if it could be held erroneous, was not prejudicial to said defendant, and no reversal could be had therefor. Chapter 32, Acts 1911".

The petition to rehear must be denied.