Hubert Bruce Jordan, Appellant,

*v.*

State of Tennessee ex rel. William H. Williams, County Attorney for Shelby County, Tennessee, Appellee.

397 S.W.2d 383.

(*Jackson,* April Term, 1965.)

Opinion filed December 13, 1965.

308

310

Lucius E. Burch, Jr., Edward G. Grogan and Charles F. Newman, Memphis, for appellant.

William H. Williams and John T. Dunlap, Jr., Memphis, for appellee.

Mr. Special Justice C. W. Miles, III, delivered the opinion of the Court.

This was an action instituted on relation of the appellee, William H. Williams, County Attorney for Shelby

County, Tennessee to oust the appellant, Hubert Bruce Jordan, from his office of County Commissioner of Shelby County, Tennessee.

Petition was filed in the Chancery Court of Shelby County on January 6, 1965 praying for the ouster of the said Hubert Bruce Jordan by decree of the Court pursuant to the so-called "ouster law" as provided by Sections 8-2701 through 8-2726, Tennessee Code Annotated, being Chapter 11 of the Public Acts of 1915, as amended. The petition charged the appellant with having knowingly or willfully misconducted himself in office as a County Commissioner during the years 1963 and 1964 by consistently utilizing over an extended period of time on numerous occasions for his own personal benefit and gain the labor of Penal Farm employees and prisoners, County Road Department employees, Penal Farm automobiles and trucks, Penal Farm supplies, tools, facilities, farm equipment, meats and other items, alleging further that the acts of the appellant were without lawful authority and occurred at his home in Whitehaven, Tennessee and, upon his farm in Hardeman County, Tennessee. Appellant was specifically charged with having county employees and prisoners confined in the Shelby County work house to perform work and labor about his home and his farm located in Hardeman County, Tennessee, of taking a large disc harrow owned by the County to his farm in Hardeman County and returning the same in a damaged condition, of taking four large rolls of used fencing wire owned by the County to his farm, of taking approximately 431½ choice selections of beefsteak, roasts and hams from the Shelby County Penal Farm and of using the Penal Farm repair shop to re-condition a truck purchased by the brother of the appellant.

Appellant filed his answer on January 15, 1965, and substantially admitted most of the acts charged in the original bill, but insisted, among other things, that he did not think that he had acted improperly and claimed his rights as prerequisites to said office of County Commissioner. Appellant further claimed that, since taking office, he had worked hard and diligently to obtain certain accomplishments for the County and that, under the circumstances, felt that he had not committed any improprieties and that the acts complained of were trivial and demanded a jury to try the issues of fact. In said answer, appellant included some twenty-one pages of alleged accomplishments while in office, which portion of his answer was stricken on motion of the appellee petitioners, the striking of which is made the subject of one of the assignments of error of the appellant, which will be discussed hereinafter. Appellant, in his answer, also denied that the petitioner was a "county attorney" or acting within his "respective jurisdiction," as those terms are governed by the provisions of Section 8-2702, Tennessee Code Annotated, and alleged that the petitioner was totally without right or authority to institute or maintain an ouster action.

The cause was submitted to a jury on certain issues submitted by the Chancellor and the jury found that the appellant knowingly or willfully had utilized for his own personal benefit or gain the work or labor of Shelby County Penal Farm employees or prisoners and that the appellant knowingly or willfully had utilized for his own benefit or gain property or supplies of Shelby County, such as fencing wire, meats, etc. Whereupon, the Chancellor entered an order ousting appellant from office.

This cause is here on appeal or writ of error prayed by the appellant and appellant assigns some thirty-nine assignments of error. These assignments of error, while quite numerous, can be grouped in the following categories, to wit:

1. Whether there was any material evidence to sustain the judgment of ouster;

2. Whether the Court erred in striking from appellant's answer the twenty-one pages dealing with his alleged accomplishments in office;

3. Whether the Court erred in refusing to permit the production by the appellee of certain statements of witnesses furnished him by the District Attorney General and investigators;

4. Whether the Court erred in overruling the issues of "fact" for the jury proposed by the appellant and substituting other issues of fact to which appellant objected;

5. Whether the Court erred in failing to dismiss the suit on the ground that the petitioner was not in fact the county attorney of Shelby County within the meaning of the ouster statutes;

6. Whether the Court erred in the admission of certain evidence objected to by the appellant;

7. Whether the Court erred in failing to charge twenty-eight special requests tendered by the appellant;

8. And whether the Court erred in answering a certain question put to the Court by the jury after the jury had retired to consider its verdict and before it had rendered its verdict.

■ The first assignment of error complains that the Chancellor erred in entering a judgment of ouster and not withdrawing the issue from the jury at the conclusion of all of the evidence in the case. This assignment necessarily requires a review of the facts of this case, and the issues submitted to the jury, keeping in mind that, on appeal from a verdict of equity suits tried before a jury, the question on appeal is whether there is any material evidence to support the verdict. *Davis v. Mitchell*, 27 Tenn.App. 182, 178 S.W.2d 889.

The issues submitted to the jury and their answers were as follows:

### I.

Did the defendant, Hubert Bruce Jordan, a Commissioner of Shelby County, knowingly or willfully, during his present tenure in office, utilize for his own personal benefit or gain work or labor of Shelby County Penal Farm inmates or prisoners?

Answer "Yes" or "No": YES

### II.

Did the defendant, Hubert Bruce Jordan, a Commissioner of Shelby County, knowingly or willfully, during his present tenure in office, utilize for his own personal benefit or gain the work or labor of employees of Shelby County?

Answer "Yes" or "No": NO

### III.

Did the defendant, Hubert Bruce Jordan, a Commissioner of Shelby County, knowingly or willfully, during his present tenure in office, utilize for his own

personal benefit or gain property or supplies of Shelby County, such as fencing wire or meats?

Answer "Yes" or "No". <u>YES</u>

## IV.

Did the defendant, Hubert Bruce Jordan, a Commissioner of Shelby County, knowingly or willfully, during his present tenure in office utilize for his own personal benefit or gain Shelby County Penal Farm equipment or facilities, such as trucks, tools, discs, harrows or other such equipment, automotive repair shops, etc.?

Answer "Yes" or "No": <u>NO</u>

As will be seen from the above questions and answers, the jury found that the appellant knowingly or willfully did utilize for his own personal benefit or gain work or labor of Shelby County Penal Farm employees or prisoners and did utilize for his own personal benefit or gain property or supplies of Shelby County, such as fencing wire or meats and the jury further found that the appellant did not knowingly or willfully utilize for his own personal benefit or gain work or labor of the employees of Shelby County or the equipment, facilities, et cetera of the Penal Farm. This being so, we will confine our discussion of the facts largely to whether or not there is material evidence to support the verdict of the jury that the appellant knowingly or willfully utilized for his own personal benefit or gain work or labor of Shelby County Penal Farm inmates or prisoners and property or supplies of Shelby County Penal Farm and whether or not the Chancellor was justified upon these findings in entering a judgment of ouster against the appellant.

Numerous witnesses were introduced by the appellee, all but three of whom were employees of the Shelby County Penal Farm working directly under the appellant, two of whom were fellow commissioners of the appellant and one of whom was a salesman for International Harvester Company. The undisputed evidence in this case is that the appellant is a man 44 years of age, attended college at the University of Tennessee night classes and possesses a law degree from Southern Law University in Memphis, although he apparently has never practiced law nor does he have a license to practice law; that he was elected to the office of County Commissioner in August, 1962, and took office on September 1, 1962, for a 4-year term and, prior to his having assumed the office, he had never been in politics before, had been an insurance agent and claims adjuster and also had worked at the First National Bank in Memphis and also for the Water and Light Department.

According to the evidence, one of the Penal Farm inmates, Eugene Williams, better known as "Big Al", carried three rolls of wire to the appellant's Hardeman County farm, along with other prisoners, which wire was used wire and, monetarily, worth very little.

On another occasion, an employee of the Road Department of the Penal Farm, one M. E. Wortham, carried Big Al in a Penal Farm truck with a load of seed to appellant's Hardeman County farm, on instructions from the appellant, which seed was unloaded by the prisoner Big Al, along with two prisoners whose fines had been paid by Commissioner Jordan. On this occasion, the prisoner Big Al seeded about one acre of land, which, according to the testimony of the prisoner, took him only five or six minutes.

On another trip, the same prisoner using a bulldozer (also referred to as tractor) got it stuck on Jordan's farm, and it appears that, on two other occasions, he and another inmate, Edward Henry Laird, better known as "Tippy" went back to assist a Penal Farm employee in getting the bulldozer out of the mud, the last occasion taking from 1:30 to 5:30 p. m. In this connection, there is evidence in the record in the form of a $68.00 check by defendant's brother that the equipment and Penal Farm employee labor in this operation was paid for.

On another occasion, it appears from the testimony of Mark Luttrell, Superintendent of the Penal Farm, that a work party of prisoners repaired a fence at appellant's home when they were brought there by O. R. Nivens, an employee of the Penal Farm and that, on this occasion, two of the inmates cut some weeds for Jordan at his home in Whitehaven. These inmates were driven to the appellant's home in a County vehicle.

On another occasion, one R. S. Chandler, a member of the patch crew working for the Penal Farm, took three Penal Farm prisoners to the home of the appellant in Whitehaven in an effort to move a deep freeze which appellant had requested that they move in order to get it out of the way of some workmen who were working on his carport and, when the first work party was unable to move the deep freeze, they procured the help of one Mr. Logan and three other Penal Farm inmates and were able to move the same. According to the testimony of other witnesses, the moving operation took only fifteen minutes, but there was some waiting period between the first trip and the procuring of the other inmates to help in the moving of the same, the entire operation taking about 90 minutes and involving 8 inmates.

On another occasion, Floyd Covey, employee of the Penal Farm, took Penal Farm inmates to appellant's home in Whitehaven to get a dead cat out from under his house, which operation took about 15 minutes. There was testimony in the record that the Penal Farm had a use for dead animals in making fertilizer, etc., and often picked them up, but there was no history of the institution getting dead animals from under the houses of any individuals.

On another occasion, a certain disc belonging to the County Farm was taken to the Hardeman County farm of th appellant and, while the jury cleared the appellant of any charges of using Penal Farm equipment, it is to be noted that five inmates loaded the disc which was kept at the Jordan farm for approximately thirty days.

On another occasion, appellant paid an inmate's fine who had eight or nine days left and took him to his farm and used him for two or three days. This procedure was not open to the general public.

The record also reflects that, beginning some nine months after appellant took office and continuing through September, 1964, the appellant had received some 442 pounds of meat consisting of steak, ground beef, beef roast, hams, cooked ham, sliced ham, bacon, sausage, pork roast, pork chops, pork ribs and lunch meat from the Shelby County Penal Farm of the total value of $249.64, the largest amount of which were received after January 1, 1964. George Chapman, Penal Farm butcher, testified that the records of the meat taken by appellant were kept separately on the orders of the Penal Farm manager, Mr. Campbell, in a special book. The system adopted after appellant came into office was to make an

original and three copies on a pad of every one who got meat, the original and one copy going to the office, the second going with the meat and the third kept by Chapman and, while this system was in effect, the records of the meat that the appellant got were kept on a pad and he was told by his supervisors to keep all of the appellant's records on it and that he gave appellant a copy and, when the book was finished, he turned the same over to the office manager, Mr. Campbell. Later on, to wit: on or about January 1, 1964, the system was changed to a new system of IBM and Chapman, the Penal Farm butcher, handed in the special book in which appellant's meat was listed and followed a new procedure and the evidence discloses there was no place in the IBM system for appellant's name and that, from the inception of the new system of recording meat rations, the meat that the appellant received was not recorded to Jordan but was recorded directly to the kitchen of the Penal Farm, which was department 22. The records were kept on department transfer tickets introduced as collective exhibit numbers 5 and 10 and there was no indication that the meat described therein went to Jordan, as it was all charged to kitchen department 22. Thereafter, no official record was kept of the meat that appellant received but, approximately 50% of the meat he received over the 18-month period, was received after the change in the method of keeping records.

The witness, Chapman, testified that he was told or came up with the idea to put a little ''b'' with a circle around it by certain meats charged to kitchen 22, the ''b'' standing for ''boss'', and whenever he put the initial ''b'' with a circle around it, that would mean that Commissioner Jordan personally got the meat. He fur-

ther testified that he made a chart of his own for his own use of all the meat that went to Commissioner Jordan from the first delivery on 5/9/63 to the last on 9/15/64. As heretofore pointed out, prior to the change to the IBM system, Jordan's name was actually listed on the meat tickets. The witness further testified that he never tried to cover up the fact that the appellant was getting the meat and that appellant never asked him to cover up the fact that he was getting the same. He further testified that one Commissioner prior to Jordan was given a turkey three or four times when they had a party at Christmas.

It thus appears without any contradiction and, in fact, is admitted by the appellant that he received the benefit of certain labor from Penal Farm inmates and that he received some 442 pounds of meat from the Penal Farm during the 17-months period, and it is undisputed that he was not entitled to receive either the labor or the supplies from the Penal Farm, (Chapter 215 of the Private Acts of 1957 definitely sets out what each commissioner is entitled to in the way of salary, emoluments or otherwise.) so the question before the Court now is whether there is any material evidence to support the finding of the jury that the appellant knowingly and willfully was the recipient of Penal Farm labor and certain supplies, such as fence wire and meat, from the Penal Farm, and whether he should have been ousted from office.

The appellant, in his testimony, testified that he learned that other commissioners had lived on the farm and had received the benefits of the commissary, however, this was under the authority of Chapter 69 Private Acts of 1945 where there was no warden or superintendent

and the commissioner acted in this capacity—this was superseded by Chapter 215 Private Acts of 1957, and that Mr. Campbell, office manager of the farm, had received such benefits after he moved off the farm and that he, the appellant, honestly felt that he was entitled to commissary privileges and that no one had told him there was anything wrong with it and that he at all times had insisted that a complete record be kept and, in this, he is corroborated by the employees of the Penal Farm who were introduced on behalf of the appellee but the Court is compelled to observe that, after the change to the IBM system, the meat was no longer charged to Commissioner Jordan and was charged to kitchen department 22 and the only way to identify the meat going to Jordan, as heretofore pointed out, was by the little "b" in a circle.

Another instance which the Court notices and which might well have influenced the jury in finding that the receiving of meats and supplies was willfully and knowingly done was that the appellant at no time ever went after the meat in person, but always ordered it through the Superintendent of the Penal Farm, whom he had appointed, one Mark Luttrell, who instructed the butcher to put the meat in certain places, sometimes in Luttrell's car, sometimes it was taken to Luttrell's house and sometimes in Luttrell's office; whereupon, Luttrell would take it to the appellant.

Appellant's fellow commissioners, Jack Ramsey and Dan Mitchell both testified that they did not know that appellant was receiving meat or using County prisoners. Commissioner Mitchell testified that, between 1940 and 1953, when the commissioner lived on the farm, he would take his meals but, in that situation, the commissioner was in actual personal charge of the institution. Com-

missioner Ramsey testified that the only property he knew of that the commissioner could use was a car furnished them. He testified to appellant's good reputation and that he would believe him on oath and that he was diligent in the discharge of his duties, as did the witnesses, Herbert Moriarity, attorney and member of the quarterly court and Edward W. Cook, member of the quarterly court. The appellant admitted the use of Penal Farm labor, both at his home and on his farm in Hardeman County, some sixty miles from the Penal Farm but insisted that, in every instance, he had not tried to conceal the fact that he had used such labor; that, in each instance, the matters had been more or less inconsequential or trivial, had not involved must time and that, at the time he was using this labor, he did not honestly believe that he was doing anything wrong. On trips that he had made to his farm with various employees or officials of the Farm, both the appellant and the officials testified that, on most of the trips, it was used for a discussion of Penal Farm business. The defendant testified, on cross-examination, that he would not use Penal Farm employees again, but did not think he was doing anything wrong at the time. Defendant testified that, after being elected, he relied heavily on employees for policies and learned from them what had gone on in the past. That other commissioners had lived on the farm and received commissary privileges and that, after former Superintendant Bryant moved off of the farm, the then Superintendent Mark Luttrell asked appellant if Bryant could continue his commissary privileges and he was permitted to do so. Appellant testified that he felt like it was all right for him to have commissary privileges and that there was nothing wrong with it. He testified that he did not intend to receive any more such privileges until

this incident is resolved and that he wouldn't use Penal Farm employees again but reiterated that he did not think he was doing anything wrong. In view of the fact that no officer is allowed to demand or receive fees or other compensation for any services other than is expressly provided by law (Section 8-2101, T.C.A.), the fact that, according to this record, Jordan, as County Commissioner, received $12,000.00 a year, a car to drive, and travel expenses, he was unquestionably not entitled to use Penal Farm labor for his own personal gain and he was not entitled to receive meat, or other personalty from the Penal Farm.

We think it is significant that, when appellant was running for this office, he admitted that, in his campaign, the following slogan was used:

"There is waste by people concerned for the re-election rather than good government; there is waste in people being sent to the Penal Farm to be rehabilitated but spending their time working on private jobs for political bosses. Let's dispose of this garbage-can waste by electing Jack Ramsey and Bruce Jordan."

Appellant admitted that this was part of his campaign slogan and admitted, on cross-examination, that he recognizes that a public officer should do nothing for his own personal benefit and gain arising out of his office. Thus, it seems that the appellant who has a law degree and some business experience, ran on a campaign to eliminate the use of Penal Farm labor, working for private interests. Thus, we must assume that he was well aware of the fact that the use of such labor for private interest was wrong and that, in doing so, he did so willfully and knowingly.

With reference to the 442 pounds of meat, in a statement voluntarily given by the appellant, the following questions and answers were propounded to him:

"Q. Commissioner, have you ever gotten any meat for your own private use from the Shelby County Penal Farm?

A. Well, sir, we have eaten at the Shelby County Penal Farm. This—I'm sure this office, maybe, from time to time the Grand Jury and others have been there.

Q. Have you ever gotten any meat from the Shelby County Penal Farm that was taken to your home either by you or someone else?

A. Yes, there has been occasion where some pieces of ham—I know Mr. Chapman—we discussed putting it in a—one of those smoking things, smokers, which—he had some ham and I tried that.

Q. Has as much as 80 pounds of meat been taken to your home at one time?

A. No, sir. Absolutely not.

Q. And that ham that you are speaking of is the only meat you can think of now that you have taken to your home. Is that right?

A. I have not taken any such measurable ham that you have just mentioned, sir. If you have reference to what I think you do, sir, I don't know, but Mr. Luttrell mentioned to me that there had been some such talk about ham, and 80, or 90 pounds I thought he said, and I asked him about it; and he said well, commissioner, the only thing I know of is that the * * * it was at his wedding, they had, Mrs. Campbell,

as I understand it was catering the wedding, and she ordered it, I thought he said, 90 pounds of ham; and some 40 or 50 pounds was used at the wedding. I was at the wedding, and, of course, I'm certain * * * Mr. Ramsey and his wife were at the wedding. They had a nice guest wedding there; and 40 pounds were returned to the commissary, as I understand it."

While appellant testified that he thought the question concerned some 80 pounds of ham and was confused in his answer, nevertheless, the questions and answers seem to speak for themselves, and we think this was less than a full disclosure of the meat received by appellant. It is also significant in ascertaining the intention of the appellant that none of the meat was ever delivered directly to him but was delivered through the Superintendent, Mr. Luttrell, and that approximately one-half of the meat after the new system of keeping books was installed was charged to kitchen 22 rather than to appellant. It is also significant that neither of the other two Commissioners knew that appellant was receiving commissary privileges and, apparently, were unaware of his use of Penal Farm labor.

The Court feels that, under all of the facts and circumstances of the case, there is material evidence to sustain the finding of the jury in their affirmative answers to questions 1 and 3 and ample evidence to sustain the judgment of ouster as a matter of law. This is not a criminal proceeding and this Court has held that there is no provision whatsoever in the ouster act or attaching to a judgment of ouster any disqualification on the part of the ousted official to hold county office in the State or

to hold the same office thereafter. *State ex rel. Thompson v. Crump,* 134 Tenn. 121, 183 S.W. 505, L.R.A.1916D, 951.

In the case of *State ex rel. Milligan v. Jones,* 143 Tenn. 575, 224 S.W. 1041, this Court upheld the ouster of a school director in failing to attend meetings of directors, signing names of others to school warrants, even though they were delivered to the proper authorities and taking coal from the school ground, even though the coal was later returned. The Court, commenting on this, speaking through Chief Justice Lansden, stated:

"We may well acquit him of an unlawful purpose in appropriating the coal which belonged to the district, but we cannot acquit him of the fact that he did so appropriate it."

In the case of *Edwards, Sheriff of Polk County v. State ex rel. Kimbrough,* 194 Tenn. 64, 250 S.W.2d 19, this Court held that a sheriff is derelict in a duty if he shuts his eyes to what is generally known in the community or purposely avoids information easily acquired which will make it their duty to act.

Incidentally, the appellant had available to him the benefit of the advice of the attorney for the Commission, Mr. Greener, of the County Attorney and, as heretofore pointed out, appellant had a law degree and this Court feels that, under these circumstances, in view of the fact that he had no right whatsoever to the commissary privileges, or the use of Penal Farm labor, the jury was well warranted in finding that he willfully and knowingly did these acts and that the Chancellor was warranted in his judgment of ouster based upon the finding by the jury.

Assignment number one is accordingly overruled and disallowed.

██ Appellant's assignment of error number two complains that the Chancellor erred in granting appellee's motion to strike from the answer asserted accomplishments set forth in said answer by the appellant as not being responsive to the issues raised in the pleadings and as being irrelevant, immaterial, prolix and unnecessary. This part of the answer which was stricken by the Chancellor contains some 21 pages of what the appellant terms "as accomplishments in office" and which appellant insists was relevant and material as to the question of his fitness to remain in office and relevant upon the further ground as to whether the petitioner knowingly and willfully did the acts alleged in the petition. The appellant was permitted by the Chancellor to prove by various witnesses his good character in general and reputation for honesty, integrity, et cetera, as well as his efficiency in office, and the Court feels that the Chancellor was correct in striking these pages from the answer for the reason that, had they been permitted to remain therein and proof introduced as to the truth or falsity of the allegations contained therein it would have opened the door to collateral issues involving innumerable witnesses, both by the appellant and by the appellee on the matter so alleged, as we see it, to an extended trial on whether or not the appellant had accomplished these various things while he was in office and would have, in all likelihood, diverted the minds of the jury from the issues of fact which were germane to the original petition filed by the appellees.

 An answer, like any other pleading, must be free from improper or irrelevant matter. Gibson's Suits in Chancery, 5th edition, Section 380, page 432; T.C.A. 21-115. As a matter of fact, it is the duty of the Court

to discountenance prolixity and the Court might have on its own motion ordered particular parts of the answer to have been stricken and, certainly, it was within the prerogative of the Chancellor upon motion of the appellee to strike the 21 pages of the answer alleging certain accomplishments of the appellant while in office.

Assignment number two of the appellant is accordingly overruled and disallowed.

Appellant's assignment number three asserts that the Chancellor was in error in excluding evidence of appellant's achievements in office and denying the tender of proof of such achievements. What we have said with reference to assignment number two applies equally to assignment number three and assignment number three is accordingly overruled and disallowed.

In appellant's assignment of error number four, it is alleged that the Court erred in denying appellant's motion for the production by the appellee of certain statements of witnesses furnished to appellee by the district attorney general and non-lawyer investigators, relying as authority in T.C.A. 24-1201, 24-1204, 24-1205. In this connection, the facts of this case disclose that the county attorney jointly participated with the district attorney in the investigation and further disclosed, as we read the record, that the Court did not deny appellant's motion based upon the privilege of the district attorney or the county attorney but at the time a subpoena was served on the district attorney, the statements were no longer in his hands. Of more significance, however, in our opinion, is the fact that all the statements sought in the subpoena duces tecum were taken from persons who were actually employees of the appellant

and were subject to his control at all times before and during the trial. A list of the witnesses was furnished to the appellant prior to the trial and on only two or three occasions throughout the trial did the appellant have occasion to or make any attempt to refer to any of these statements while examining the witnesses or try to impeach the witness with such statements. Of further significance is the fact that the appellant admitted every material fact except the issue of good faith and had it within his power to interview each and every one of the witnesses from whom statements had been taken, all of whom would presumably be friendly with the appellant as they were, before and after the trial, his employees.

The Chancellor was certainly within his rights, under Section 24-1205, T.C.A., in limiting the manner of taking and the scope of examination of the district attorney general relative to said statements. Learned counsel for the appellant cites the case of *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, in support of his contention. Appellant also cites the case of *Marlowe v. First State Bank of Jacksboro,* 52 Tenn.App. 99, 371 S.W.2d 826, asserting that, particularly Section 24-1205, T.C.A., is practically identical with the provisions for taking depositions contained in Rule 30(a) and (b) of the Federal Rules of Civil Procedure.

In the Marlowe case, the Court of Appeals of Tennessee, speaking through Judge Cooper, simply held that, where the plaintiff was required to give her discovery deposition, in the absence of exceptional circumstances, the plaintiff must make himself available for such examination at the situs of the forum and at his own expense and, in said case, the Court of Appeals apparently relied upon certain Federal Court decisions construing

the Federal Rules of Civil Procedure found in Rules 26, 30(b), (d) and 31(d), which the Court stated were identical with the rules found in T.C.A. 24-1201 et seq., and did follow the Federal decisions relative to the particular question involved in that case.

However, in comparing Section 24-1205, T.C.A., with Rule 30(b) of the Federal Rules of Civil Procedure, we find this language which is not contained in Rule 30(b) of the Federal Rules of Civil Procedure relating to discovery depositions:

"[T]hat a party shall not be required to disclose names of witnesses or disclose or produce things pertaining to the litigation where the requesting party has not, in the discretion of the court, used diligence to discover such things for himself."

We think that this language does make some distinction between the Tennessee statutes and the Federal Rules on this subject and, of course, in the case at Bar, these witnesses were certainly as easily available to the appellant as to the appellee, they being appellant's own employees.

In the case of *Anderson v. State,* 207 Tenn. 486, 341 S.W.2d 385, this Court held, in a criminal case, in the prosecuting for theft from a jewelry store that the trial court did not err in overruling a motion for an order directing the State to produce written statements that certain witnesses had given to the police and to the FBI in the absence of any showing to the Court that such statements were still in existence *and,* in some way, relevant and needful to the defense. Appellant, in the present case, first sought discovery of the county attorney of the names and addresses of the witnesses to be relied

upon by the appellee, which was granted. He next sought to interrogate appellee to establish the presence of political animus in the filing of the suit, which was overruled as not a material issue. Appellant next sought discovery to require the delivery of all statements or recorded tapes taken by appellee or any of his assistants, which was denied, apparently, upon the grounds that the witnesses were equally available to the appellant, as we have heretofore pointed out. Appellant next issued a subpoena duces tecum to require the district attorney to turn over to him all statements, recordings, tapes, et cetera, which, at that time, were not in the physical possession of the parties under subpoena and said subpoena duces tecum was quashed. In any event, the Court finds that all of the information sought in both the depositions taken of the attorney general and his investigators and in the subpoena duces tecum was easily available to the appellant, because all of the statements were taken from persons then in his employ and the Court feels that the Chancellor, under our discovery statutes, particularly 24-1205, T.C.A., was within his discretion in quashing the various subpoenas duces tecum and in limiting the scope of the examination of the attorney general and the investigators, and, from a reading of the record in this case, we cannot see how the appellant has in any way been prejudiced by the action of the Court in this respect.

Assignment number four is accordingly overruled and disallowed.

Appellant's fifth assignment of error alleges that the Court erred in overruling the issues of fact for the jury proposed by the appellant and substituting other issues of fact to which appellant objected.

■ The first issue of fact "proposed by the appellant" was as follows:

*Question:* Did the defendant knowingly or willfully misconduct himself in office?

*Answer:* Yes or no.

This was, at best, a mixed question of fact and law and, in the Court's opinion, was not a proper question to be submitted to the jury, as it would virtually be permitting the jury to make the ultimate decision in the case rather than the Chancellor.

■ After the appellant suggested the foregoing issue, the Court suggested four issues of fact for the jury which have been heretofore set forth in this opinion in the Court's discussion of assignment number one.

Whereupon the appellant proposed the following issues of fact:

I.

"Was the defendant, Hubert Bruce Jordan, a Commissioner of Shelby County, guilty of knowing or willful misconduct, during his present tenure in office, in that he utilized for his own personal benefit or gain work or labor of Shelby County Penal Farm inmates or prisoners?

"Answer 'Yes' or 'No': ———

II.

"Was the defendant, Hubert Bruce Jordan, a Commissioner of Shelby County, guilty of knowing or willful misconduct, during his present tenure in office, in that he utilized for his own personal benefit or gain the work or labor of employees of Shelby County?

"Answer 'Yes' or 'No': ———

### III.

"Was the defendant, Hubert Bruce Jordan, a Commissioner of Shelby County, guilty of knowing or willful misconduct, during his present tenure in office, in that he utilized for his own personal benefit or gain property or supplies of Shelby County, such as fencing wire or meats?

"Answer 'Yes' or 'No': —————

### IV.

"Was the defendant, Hubert Bruce Jordan, a Commissioner of Shelby County, guilty of knowing or willful misconduct, during his present tenure in office, in that he utilized for his own personal benefit or gain Shelby County Penal Farm equipment or facilities, such as trucks, tools, discs, harrows, or other such equipment, automotive repair shops, etc.?

"Answer 'Yes' or 'No': —————

And complains that the Court erred in not submitting the above issues of fact to the jury rather than those actually submitted.

The Court feels that the issues of fact proposed by learned counsel for the appellant were, at best mixed questions of law and fact and would have had the jury determine the final issue, to wit: Whether or not the appellant, Hubert Bruce Jordan, was guilty of willful misconduct in office.

■ We are aware of the fact that it is sometimes permissible to submit mixed questions in law and fact, such as whether a transaction was fraudulent or carried on through mistake or whether due diligence was exercised,

but it is preferable, if the jury should be called upon to find solely issues of fact in cases where special verdicts are reported, leaving to the Chancellor the application of the rules of law. Gibson's Suits in Chancery, 5th Edition, Section 580, pages 638-639. Citing *Madison Trust Company v. Stahlman,* 134 Tenn. 402, 183 S.W. 1012; *McElya v. Hill,* 105 Tenn. 319, 59 S.W. 1025.

We think the propositions of fact as submitted by the Chancellor fully protected the rights of the appellant in that the words "knowingly" or "willfully" were included in each and every one of the propositions of fact submitted by the Chancellor to the jury; whereas, as we have heretofore stated, the propositions submitted by the appellant were, at best, mixed questions of fact and law and would, in effect, have amounted to having the jury decide the final issue in this case.

Assignment number five of the appellant is accordingly overruled and disallowed.

 Appellant's sixth assignment of error complains that the Court erred in overruling appellant's motion to dismiss on the ground that the appellee was not the County Attorney of Shelby County within the meaning of the ouster statutes and on the ground that, in bringing this suit, the appellee was not acting "within his jurisdiction" within the meaning of the statute.

At the outset, appellant concedes that the appellee is the official County Attorney appointed by the Shelby County Quarterly Court by authority of Chapter 2 Private Acts of 1937, as amended, and that he was so titled at the time of the filing of this suit on January 6, 1965. Section 8-2702, T.C.A., provides, in substance, that the **attorney general** shall have power on his own initiative

and without any complaint to institute proceedings in ouster against all state, county and municipal officers under the provisions of the ouster chapter (referring to sec. 8-2701, et seq. T.C.A.) and that the district attorneys, county attorneys and city attorneys within their respective jurisdictions may institute such actions without complaint being made to them or request made of them, etc. It is the insistence of learned counsel for the appellant that the words "within their respective jurisdictions" deprived the county attorney, the appellee herein, of his authority to bring said suit by reason of Chapter 237 of the Private Acts of 1911, as amended, by Chapter 215 of the Private Acts of 1957, wherein the power of the Shelby County Quarterly Court was transferred to the Shelby County Board of Commissioners with the exception of the Shelby County Quarterly Court's constitutional functions. This record discloses that the County Attorney represents the County Court and, on occasions, the County Commissioner and that Eugene Greener, attorney retained by the County Commission, could in no sense of the word be considered a County Attorney.

We think that the words "within their respective jurisdictions", where referred to district attorney, county attorney and city attorney, mean exactly what they say, to wit: The city attorney to prosecute actions of ouster against certain city officials: whereas, he could not so prosecute against county officials, the county attorney against county officials, and, in this connection, we hold that the appellant, Bruce Jordan, is a county official, and the district attorney would have the general power to prosecute under the ouster laws any public official who had misconducted himself.

■ This Court expressly holds that the County Commissioners are county officers within the meaning and intendment of the ouster action under Section 8-2701 to 8-2726, T.C.A., and the decision of this Court in the case of *Shelby County Board of Commissioners v. Shelby County Quarterly Court,* 216 Tenn. 470, 392 S.W. 2d 935, in no way, in our opinion, affects the validity of the office of county attorney or his authority to bring ouster suits under the ouster statutes involved in this case.

This Court holds also that Mr. Eugene Greener, a private attorney retained by the Commission as special counsel, was never the official county attorney within the meaning of the ouster statutes.

Commissioner Jack Ramsey, in his testimony in this suit, testified that, the County Commission has used the County Attorney, that it has always been so, before, during and after the trial of that case brought by the *Shelby County Board of Commissioners v. Shelby County Quarterly Court.*

■ The Legislature of the State of Tennessee has prescribed the mode of procedure through which removal may be affected through the ouster statutes, and the authority of the County Attorney to bring said suits is vested by State Legislature, and not by the County Court or County Commission; under Article VII, Section I of the Constitution of Tennessee, it is declared that county officers including justices of the peace, shall be removable from office for malfeasance or neglect of duty and clothes the Legislature with the power to prescribe the mode of procedure through which removal may be affected. *State ex rel. v. Ward,* 163 Tenn. 265, 43 S.W.2d

217. Thus, the Legislature has the unquestioned authority to prescribe the mode of procedure which it has done.

The Court finds that the appellee is the duly qualified and acting attorney of Shelby County and, as such, was entitled to bring the suit for ouster against appellant and, accordingly, the sixth assignment of error is overruled and disallowed.

██ Appellant's seventh assignment of error complains of the admission of evidence relating to the alleged alteration of a certain $68.00 check issued by appellant's brother, Jerry Jordan.

The testimony by Mr. Campbell, office manager of the Penal Farm, who was asked about this check, was that he received from Mark Luttrell, Superintendent of said Farm, a check dated September 23, 1964 for $68.00 made out by Jerry Jordan, appellant's brother. This check was introduced by stipulation of counsel. There is no proof of the alteration of this check, but apparently, there was something written on another $68.00 check that Campbell received from Jerry Jordan that was not on the check introduced and Campbell wrote a receipt listing information on the check that he had received which, however, was not the check introduced into evidence, which receipt listed the information on the original $68.00 check as follows:

| | |
|---|---|
| "Use of truck | $23.00 |
| Disc | 5.00 |
| Labor to remove tractor | 40.00 |
| Total | $68.00 |

Dated October 26, 1964.''

The evidence is somewhat confused as to why there were two $68.00 checks and why one had certain information that the other one did not have and why a receipt had to be issued listing information on the original $68.00 check which was not on the check introduced.

We think that there was no prejudicial error in introducing evidence concerning the same, because, in any event, this check was evidence that certain payments had been made by appellant's brother for work done on the farm jointly owned by appellant and his brother and, to this extent at least, should have been helpful to the appellant and we find no error for the further reason that said check was introduced by stipulation of counsel and no further check was introduced.

The seventh assignment of error is accordingly overruled and disallowed.

In assignment number eight, appellant complains of the Court's overruling his exception to the testimony of the witness, Mark Luttrell, concerning the prisoner's relief fund and the introduction of Exhibit 19 relating to the prisoner's relief fund and certain notations opposite the names of two inmates.

In order to discuss this assignment of error, we need to go briefly into the testimony concerning the prisoner's relief fund. It appears that this is a fund, as its name implies, to assist prisoners in case of need and sometimes to assist them when they are released from prison and that said fund is administered by the Superintendent, Luttrell, and the Penal Farm Chaplain. It further appears that Exhibit number 19, which was introduced by stipulation of counsel, showed thereon opposite the name of James M. Rogers the sum of $9.60 and opposite the

name Sylvester Hill the sum of $34.00 and, in parenthesis, Commissioner Jordan and which shows that these fines had been paid out of the prisoner's relief fund. Initially, when the question came up as to what the prisoner's relief fund chart showed, Mr. Burch, appellant's counsel, suggested that the prisoner's relief chart be made an exhibit and it was introduced by stipulation as Exhibit 19.

The appellant testified that he had made a $50.00 check to cash which was given to Superintendent Luttrell on October 9, 1964 to repay this amount, but the defendant's counsel objected to any further questioning concerning the relief fund, because he was not charged with taking money from said fund, which objection was overruled. While appellant did not have the $50.00 check at the time he first testified, it was later produced in evidence and appeared to have been dated on October 9, 1964 and was made Exhibit 20 and it was shown that it had been deposited to the Penal Farm account. There was then introduced as collective Exhibit 21 receipts showing the payment of both prisoners' fines, one dated September 23, 1964 and one dated September 25, 1964 with Jordan's name on the same, indicating it had been paid by him. Jordan testified that he did not know why the release was charged against the prisoner's relief fund, but testified that he called Superintendent Luttrell and asked him to take care of it for him and that he gave Luttrell a $50.00 check to cover the same. Appellee did make considerable of the fact that the $50.00 check dated October 9, 1964 was dated after the receipts introduced as Exhibit 21.

Superintendent Luttrell testified that the facts concerning the incident were that Jordan had told him that

he needed a man or men to work on his farm and that he told Luttrell to pay him out, that Luttrell did this, and a week or ten days later, Jordan started to write Luttrell a check for $40.00 to which Luttrell replied, ''Commissioner, that won't do,'' so he wrote him a check for $50.00 and gave Jordan back the balance in cash.

With reference to how the receipts introduced as collective Exhibit 21, heretofore referred to, originated, Luttrell testified that he had a Mrs. Martini write out the receipts and that Luttrell paid her out of the fund, put the receipts in the pouch instead of money; two days later, did the same thing with reference to another prisoner; and, when Jordan later repaid it, put the balance in the relief fund and took the receipts out.

In view of the fact that Exhibit 19, which was complained of, was admitted into evidence at the specific request of appellant's attorney, who made no objection thereto, and, even though the prisoner's relief fund was not directly an issue in the case, the Court finds that, in view of the fact that the testimony elicited both from Jordan and Luttrell does, apparently show that the fund was repaid the amount of the prisoners' fines, and in view of the following charge given to the jury by the Chancellor:

''You are also charged that the payment or unpaid fines of the prisoners, James Rogers and Sylvester Hill, from the prisoners relief fund or the manner of the handling of the prisoners relief fund are not issues in this case and may not be considered by you in your determination of any of the issues of fact submitted to you.''

The appellant was not prejudiced by either the admission of Exhibit 19 or the testimony elicited and assignment number eight is accordingly overruled and disallowed.

 Appellant, in assignment number nine, avers that the Court erred in refusing to grant appellant'; motion for a mistrial on the basis of the admission oi Exhibit 19 and the testimony on cross-examination of the appellant. What we have said with reference to assignment number eight equally applies to number nine and, since appellant elected to take the stand, the scope of his examination rested largely in the discretion of the Trial Court. *Turner v. State,* 188 Tenn. 312, 219 S.W.2d 188. And, by taking the stand, appellant opened the door for cross-examination within limits as to previous acts involving moral turpitude, subject, of course, to the limitation of such evidence in its effect to his credibility as a witness. *Brooks v. State,* 187 Tenn. 67, 213 S.W.2d 7.

Assignment number nine is accordingly overruled and disallowed.

 Assignment number ten complains of the following portion of the Chancellor's charge, to wit:

"You are charged that in your consideration of the issues submitted to you that the determination of the words 'knowingly or willfully' in those issues is not determined by expressions of individual opinion of motive or good faith or intent to receive only that to which an officer is entitled by law, but you should consider whether the acts or actions complained of were done with such indifference or such an entire want of care as would raise a presumption of a conscious indifference to consequencies or the law fixing com-

pensation, perquisites and emoluments of office. The words 'knowingly and willfully' also are not confined to a studied or deliberate intent to go beyond the bounds of the law but also encompass a mental attitude of indifference to consequences or failure to take advantage of means of knowledge of the rights, duties or powers of a public officer holder. However, simple negligence in discharging the duties of an officer does not constitute or amount to an officer acting knowingly or willfully. In determining whether the acts embodied in the issues submitted to you were done knowingly or willfully, you, as jurors, will use and employ your good, plain common sense.''

We have carefully examined the part of the charge complained of, as well as the entire charge of the learned Chancellor in this case, and we are unable to agree with learned counsel for the appellant that the Court charged that simple negligence is sufficient to constitute willful or knowing misconduct. To the contrary, the Chancellor charged just the opposite, as will be seen by the above excerpt from his charge, and told the jury, in plain terms, that simple negligence did not constitute or amount to an officer acting knowingly or willfully. We think the language in the charge is entirely consistent with the decisions of this Court, as set out in *State ex rel. Thompson v. Crump,* supra, *State ex rel. Milligan v. Jones,* supra, *Edwards, Sheriff of Polk County v. State ex rel. Kimbrough,* supra and *State of Tennessee ex rel. v. Edgar H. Smith,* 158 Tenn. 26, 11 S.W.2d 897.

In the Smith case, this Court held that the action of the chairman of the County Board in procuring a rubber stamp bearing a facsimile of his signature and authorizing the Clerk to affix this stamp to county warrants

amounted to a conscious and willful negligence of an important duty enjoined upon him.

In the case of *State ex rel. Thompson, Attorney General v. Reichman,* 135 Tenn. 685, 188 S.W. 597, this Court held in the ouster of a sheriff that a public officer cannot close his eyes to law violations and make no effort to enforce the law and that such conduct is willful misconduct within the meaning of the ouster statute. Counsel for appellant cites the case of *State ex rel. Barnes v. Stillwell,* 165 Tenn. 174, 54 S.W.2d 978, wherein a recently elected justice of the peace, with no knowledge of the law, upon advice of Circuit Court Clerk, issued sheriff warrants for John Doe and three other colored men and, upon the return of the warrant, prepared and signed a new warrant as the one under authority of which the sheriff was made and this Court held that, under those circumstances, this did not amount to willful conduct so as to require an ouster, but that case is entirely different from the case at Bar.

From an examination of other cases brought under the ouster statutes, most of which have been cited above, we think the part of the charge complained of by counsel for the appellant was a proper charge and that the Chancellor properly charged the jury with the words ''knowingly'' and ''willfully'' are not confined to a studied or deliberate intent to go beyond the bounds of the law. In fact, this Court, in the case of *State ex rel. Milligan v. Jones* brought under the so-called ouster act, held that the ouster statute had no reference to the intent with which the misfeasance was committed in that particular case, but still held that the misfeasance was knowingly and willfully committed.

We, accordingly, held that the part of the charge complained of was a proper charge and assignment number ten is accordingly overruled and disallowed.

Assignment number eleven complains that the Court erred in refusing to give in charge to jury appellant's theory, contention and legal effect of the same in that he incorrectly charged the theory of the appellant and its legal effect. Without going into detail as to this assignment, we have examined the portion of the charge complained of, think that it is adequate in charging appellant's theory of the case and the legal effect thereof and said assignment is accordingly overruled and disallowed.

Appellant's assignments numbers 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36 and 37 complain of the refusal of the Chancellor to give appellant's special requests numbers 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27 and 28.

This Court has examined the special requests offered by the appellant and finds that most of them appear to have been taken from excerpts of decisions rendered by this and other Courts in ouster cases, but the Court has thoroughly examined the 14-page charge of the Chancellor to the jury and find that the charge has adequately covered, in general, the matters contained in such special requests and has fully protected the rights of the appellant in said charge. Most of the special requests are concerned with an emphasis upon the magnitude and gravity of the charges, the honest belief of the person charged, plus the emphasis on the knowing and willful misconduct which must be found. The charge of the

Court properly emphasized the elements of knowingly or willfully utilizing Penal Farm inmates and of knowingly and willfully receiving meat from the Penal Farm and, among other things, the Chancellor charged the jury as **follows**:

"The Court charges you that where forfeiture of a public office is demanded on charges of knowledgeable or willful misconduct in office, the paramount consideration in scrutinizing the acts of the defendant officer is whether they bear or do not bear the distinguishing characteristics of genuine good faith, not whether those acts are technically free from error when viewed under rigid and careful scrutiny."

In short, the Court, throughout his charge, emphasized the fact that the ouster statute was not designed for the removal of an officer merely for the improvement of public service, or because he had been inefficient or because he had acted with bad judgment or lack of knowledge or for insignificant or inconsequential acts or omissions or merely mistaken judgment and charged the jury that, if they should find such to be the case, they would answer "no" to any issues which embody such character of act or acts.

We think that an examination of this charge shows that the Chancellor very carefully protected the rights of the appellant, as well as the appellee and that it contained all proper matters to be given the jury in charge and accordingly assignments of error numbers 12 through 37 are overruled and disallowed.

Appellant's assignment number thirty-eight is, in effect, that the Court erred when, after the jury had retired to consider its verdict, the jury returned and,

through its foreman, asked the Court if a "yes" answer by the jury to any of the four issues of fact submitted to it would result in ouster of the appellant and the Court answered as follows:

"You are called upon to answer the specific issues that the Court has delivered to you, of course, in accordance with the instruction of the Court which have been given to you. Any ouster or removal from office is the responsibility of the Court and not the responsibility of the jury."

This was a correct statement of the responsibility of both the Court and the jury. Then, too, the Court had charged the jury as follows:

"So that you, as jurors, may be advised, the Court instructs you that an affirmative answer to one or more of the issues of fact submitted to you for answer may subject the defendant Jordan to ouster and removal from office."

In our opinion, the Court correctly stated the law in both his reply to the jurors question and in his general charge.

Assignment number thirty-eight is accordingly overruled and disallowed.

Appellant's assignment number thirty-nine complained that the Court erred in not withdrawing the issues in pronouncing judgment in favor of the appellant at the conclusion of all of the evidence in the case, citing five reasons for appellant's insistence, as follows:

 (a) There was no evidence to justify submitting the issues.

 (b) The issues, though requiring the jury to particularize, did not permit full particularization.

(c) The issues submitted gave no opportunity to the jury to make a specific finding of fact upon the issue of misconduct.

(d) The issues were susceptible of construction by the jury that the knowing and willful doing of acts described in the issues were synonymous with knowing and willful misconduct.

(e) The facts established by the evidence when considered in the light of the entire record did not establish the unworthiness of the defendant.

As we have already stated in our discussion of assignment number one, there was ample evidence to justify submitting the issues to the jury and we have heretofore held that the issues submitted to the jury were proper issues of fact and we think gave the jury ample opportunity to make specific findings of fact and the issue of misconduct in office was a question of law to be decided by the Court and not the jury.

We further find that the issues submitted were not susceptible to misconstruction by the jury and this is further evidenced by the fact that the jury returned the answer of "yes" to 1 and 3 and "no" to 2 and 4. We further find that there is material evidence in the record to warrant the ouster of the appellant from public office by the Chancellor upon the findings of fact by the jury and, as heretofore stated, there is material evidence to support the findings of fact by the jury. After all "The American concept of a public official is that of a public agency or trust created in the interest of and for the benefit of the people." 42 Am.Jur. Sec. 8, p. 885.

Assignment number 39 is accordingly overruled and disallowed.

We find no error in the judgment of the Chancery Court of Shelby County and the cause is accordingly affirmed. The appellant will pay the cost of the cause.

BURNETT, CHIEF JUSTICE, WHITE and CHATTIN, JUSTICES, and ERBY L. JENKINS, SPECIAL JUSTICE, concur.