IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 10, 2010 Session

**JEFFERSON COUNTY, TENNESSEE v. MARGARET V. SMITH**

**Appeal from the Circuit Court for Jefferson County**
**No. 20,720-II     Allen W. Wallace, Sr. Judge**

_____

**No. E2009-02674-COA-R3-CV-FILED-JULY 26, 2011**

_____

Jefferson County, Tennessee filed a petition against Margaret Vance Smith, seeking to recover possession of the unexecuted marriage license issued to David ("Davy") Crockett and Margaret Elder by the county's clerk in 1805. The action was filed pursuant to Tenn. Code Ann. § 39-16-504, which prohibits the destruction of, tampering with, or fabrication of government records. The trial court entered a final judgment against Mrs. Smith, ordering the immediate return of the marriage license to Jefferson County. Mrs. Smith appealed. We affirm as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., and D. MICHAEL SWINEY, JJ., joined.

Kelli L. Thompson, Knoxville, Tennessee, for the appellant, Margaret V. Smith.

S. Douglas Drinnon and Larry Ray Churchwell, Dandridge, Tennessee, for the appellee, Jefferson County, Tennessee.

**OPINION**

**I. BACKGROUND**

This case originates from the possession by Defendant Margaret Vance Smith of the

purportedly authentic marriage license issued to David Crockett and Margaret Elder[1] ("Crockett license") on October 21, 1805, by Joseph Hamilton ("J. Hamilton"), who served as the county court clerk for Jefferson County in the early 1800s. It is undisputed that the Crockett license indicates on its face that it is a document that was issued by the State of Tennessee, Jefferson County. The marriage license at issue, however, was never executed[2] and was returned to the Jefferson County courthouse, where it remained for approximately 125 to 135 years until its removal in the late 1930s or early 1940s.

Prior to this lawsuit, Mrs. Smith, who lives in Florida, started corresponding with Dr. Estle Muncy, a member of the Jefferson County Historical Society, in the mid to late 1990s about the Crockett license. In one of Mrs. Smith's letters to Dr. Muncy, she describes how the document came to be in her possession through the initial action of her uncle, Harry Vance, who served as Jefferson County Trustee from 1917-1926 and Chairman of the Jefferson County Court into the 1940s:

> In the late [19]30's or early [19]40's—I'm unsure of the exact year—my mother, father, and I were in Dandridge [Tennessee] for one of our periodic summer visits, staying as always at great-aunt Nina (Mrs. Hal S.) Harris' home. My father, Paul Vance, usually spent time down in town visiting old friends and his brother, Harry. When Dad returned that day he showed me the marriage document, saying Uncle Harry had given it to him. Uncle Harry told Dad they were clearing out the courthouse of a lot of papers because of more room and space needed and he thought Dad "would get a kick out of having that particular piece of paper." Just who "they" might have been, I've no idea. I've always assumed it to be people who had offices in the building. The paper was creased and folded. Dad left it that way, tucked it away in his desk drawer, where it remained until his death. Some years later, my mother (Margaret Harris, daughter of Clarence E. and Mollie Lillard Harris) gave it to me.[3]

---

[1]There is some uncertainty as to the actual surname of the woman to whom David Crockett was betrothed. The legibility of Margaret's last name as it appears on the face of the marriage license has diminished over time due to the age of the document and a well-worn crease that runs through the surname of Crockett's fiancé. It is believed that Margaret's surname is most likely Elder or Eller. While acknowledging this uncertainty in the record, we refer to Crockett's wife-to-be in the subject marriage license as Margaret Elder.

[2]The marriage between Crockett and Elder never took place. According to legend, Crockett's betrothed eloped with someone else. Crockett married Polly Findley a year later.

[3]Regarding the subject marriage license, Mrs. Smith wrote in a letter dated May 12, 1996: "I've had
(continued...)

In responding to Mrs. Smith's account of how she acquired the Crockett license, Dr. Muncy wrote in his letter of July 25, 1995, that he was "sorry to hear that this historically sensitive document was almost destroyed and even more distressed to learn that other papers of unknown value were apparently discarded." Dr. Muncy also wrote in the same letter: "We understand that you do not wish to consider loaning or donating the Crockett document to our museum at this time. If in the future you change your mind, we would be most pleased to have it returned to its county of origin." Mrs. Smith sent a professionally prepared photograph of the original Crockett license to Dr. Muncy for display in the Jefferson County Museum.

In the summer of 1999, Mrs. Smith traveled to Dandridge, Tennessee, to meet with Dr. Muncy, Rick Farrar, and Lura Hinchey. At that time and during the trial proceedings, Mr. Farrar was County Clerk for Jefferson County, and Ms. Hinchey, a certified archives manager in the State of Tennessee, was the Director of the Jefferson County Archives. At this meeting, Mrs. Smith discussed her possession of the Crockett license and expressed dismay that a copy of the marriage license was not on display at the Jefferson County courthouse museum. The affidavits of Mr. Farrar and Ms. Hinchey stated that Mrs. Smith refused to return the document when both Jefferson County officials advised her that the Crockett license was a historical Jefferson County document and rightfully belonged to the County.

Mrs. Smith and the Crockett license were featured on an episode of the television program Antiques Roadshow that aired on January 9, 2006. The broadcast highlights of the show provided the following synopsis:

> The king of the wild frontier's first adventure—marriage—was over before it even started when his first love left him at the altar. Even though Davy Crockett's wedding ceremony never took place, the marriage license that had been filled out was saved, and it eventually found its way into the hands of Margaret from Tampa who brought it to the ROADSHOW. Margaret's uncle, a Davy Crockett fan, had grabbed it when the archives of the Dandridge, Tennessee courthouse were being cleaned out. They were throwing away all things that were considered "unimportant," and since the marriage never happened, they felt the marriage license had no value whatsoever.

---

[3](...continued)
this document in my possession since the 1930's, and it has been researched and authenticated." This letter suggests that Mrs. Smith has had possession of the Crockett license since its initial taking and contradicts her previous account of how she came to possess the document.

On January 26, 2006, County Attorney Jeffrey L. Jones, who was representing Jefferson County in this matter, sent a letter to Mrs. Smith, demanding the return of the Crockett license and informing her that her possession of a "protected public document" was in violation of Tenn. Code Ann. § 39-16-504. Mrs. Smith, through the representation of her Florida attorney, refused to return the license, stating that it had been "abandoned as trash by the Clerk of Court after determination that retention of the materials was not required." Mrs. Smith has consistently refused to return the Crockett license to the County. In her deposition of October 28, 2009, Mrs. Smith again asserted: "I refuse to return [the Crockett license]. It's going to stay in my possession."

On February 27, 2006, the County initiated this cause of action against Mrs. Smith to recover possession of the Crockett license, alleging that Mrs. Smith "continues to intentionally and unlawfully conceal, possess, and impair the availability of the license" in violation of Tenn. Code Ann. § 39-16-504 and the common law of Tennessee. The County's lawsuit further averred that the Crockett license is a governmental record and document legally belonging to and necessarily maintained by the County for information. In response to the County's complaint, Mrs. Smith filed a Motion to Dismiss in March 2006, alleging insufficient minimum contacts with the State of Tennessee for her to be subject to the personal jurisdiction of the court.[4] The trial court denied the motion.

In May 2008, Mrs. Smith filed an Answer, asserting two affirmative defenses. First, she alleged "that the County abandoned the item here in question and, therefore, has no right to its possession." Second, she also contended "that the document herein at issue is not a public record and, therefore, the County is not entitled to its possession." In August 2008, Mrs. Smith filed a Motion to Amend Answer in order to raise two additional affirmative defenses in response to information revealed during discovery. During the deposition of Mr. Farrar in August 2008, it was learned that the Jefferson County Clerk was aware of the fact that Mrs. Smith had possession of the subject marriage license by 1991[5] and had at no time prior to the Dandridge meeting of 1999 asked her to return the document. In her amended Answer, Mrs. Smith alleged that Jefferson County's cause of action is barred by the statute of limitations pursuant to Tenn. Code Ann. § 28-3-105(3) and that the doctrine of laches prevents the relief sought by the County.

This matter came to trial on November 19, 2009. Five days later, the trial court

---

[4] In her second affidavit, Mrs. Smith stated that at the Dandridge meeting in the summer of 1999, no one alleged that the document was a "government record."

[5] Parties in this lawsuit stipulated to the admissibility of a letter dated November 11, 1991, from Mrs. Smith to Mr. Farrar.

entered a judgment against Mrs. Smith, setting forth its findings of fact and conclusions of law in a memorandum opinion. The trial court found that the Crockett license constitutes a "Jefferson County historical document" and that title to the document belongs to Jefferson County. The trial court noted:

> The explanation given as to how this got out of the records down there, that -- that dog just won't hunt. . . . [I]t just don't make sense that you can have all of the other documents immediately preceding that and subsequent to that, they're all still official records, they're still in the clerk's office of Jefferson County.

> * * *

> This is the whole argument, someone, and the circumstantial evidence is a member of Mrs. Smith's family, took that document. I don't care if there's a building named after him or half of the county is named after him, they took that document out of a depository of the county and a member of the family has still got it. It's Jefferson County's document. The title is in Jefferson County, period. She's got to return it.

The court ordered Mrs. Smith to immediately return the Crockett license to Jefferson County. The memorandum opinion also stated, in part, that the trial court attributed very little "probative value to [Mrs. Smith's] deposition" due to her advanced age and the fact that her son, who is an attorney, "was kind of coaching her along."[6]

Upon the judgment of the trial court, Mrs. Smith filed a timely notice of appeal but failed to return the license. On January 4, 2010, the County filed a Motion for Order Enforcing Judgment for Specific Act and for Contempt. On February 1, 2010, the trial court entered an order requiring Mrs. Smith to return the Crockett license to Jefferson County on or before February 7, 2010. Otherwise, Mrs. Smith would be fined five hundred dollars ($500.00) per day after that deadline until the marriage license was returned. On February 12, 2010, Mrs. Smith filed a Motion to Stay Order and Set Bond. The trial court entered an order granting Mrs. Smith's Motion to Stay but under the following terms and conditions: (1) that the marriage license at issue be placed with the clerk of the Circuit Court of Jefferson County, Tennessee; (2) that the clerk transfer the license in accordance with the order of the court upon conclusion of the appellate process; and (3) that the fine established by the

---

[6]Mrs. Smith was 89 or 90 years old when she was deposed on October 28, 2009. She did not attend the trial proceedings because of poor health and mobility.

February 1, 2010 order remain in effect until the subject license is placed with the specified court officer. Mrs. Smith returned the Crockett license, and an acknowledgment of receipt of the license was filed on February 19, 2010.

## II. ISSUES

Mrs. Smith raises nine issues for appellate review, which we restate as follows:

1. Whether Jefferson County had standing to file an action to recover the Crockett license pursuant to Tenn. Code Ann. § 39-16-504.

2. Whether the Crockett license was a governmental or public record.

3. Whether Jefferson County met its burden of proof that the Crockett license was unlawfully removed from its possession or that Mrs. Smith wrongfully converted it.

4. Whether the evidence regarding the records maintained by Jefferson County around the early 1800s demonstrated that the County did not abandon or discard any records.

5. Whether the trial court erred in making findings regarding David Crockett and his historical significance which were not based on any evidence admitted at trial but based purportedly on the trial court's personal knowledge.

6. Whether the trial court erred in refusing to consider the recorded recollection of Mrs. Smith given on the television program, Antiques Roadshow, or from her letters to Jefferson County officials as evidence of the manner in which Mrs. Smith acquired ownership of the Crockett license.

7. Whether the trial court erred in allowing a criminal statute, specifically Tenn. Code Ann. § 39-16-504, to form the basis of a civil cause of action and to apply retroactively to take personal property from a private citizen in violation of the Tennessee Constitution.

8. Whether the trial court properly admitted into evidence the testimony of Jefferson County archivist Lura Hinchey.

9. Whether the trial court erred in requiring Mrs. Smith to immediately return

the Crockett license, notwithstanding her appeal, and subjecting her to penalties in the amount of $6,000.

## III.  STANDARD OF REVIEW

The matter before us on appeal was adjudicated without a jury.  We therefore review the decision de novo upon the record of the proceedings with a presumption of correctness as to the factual findings of the trial court.  *See* Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).  We impute no presumption of correctness to the trial court's conclusions of law.  *Rutherford County v. Wilson*, 121 S.W.3d 591, 595 (Tenn. 2003); *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996).  The judgment of the trial court should be affirmed, absent errors of law, unless the preponderance of the evidence is against those findings.  *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001).  In cases where the trial court's findings of fact depend on a determination of witness credibility, we will not reevaluate that assessment in the absence of clear and convincing evidence to the contrary.  *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *Newman v. Woodard*, 288 S.W.3d 862, 865 (Tenn. Ct. App. 2008).

## IV.  DISCUSSION

### A.

Mrs. Smith asserts that the trial court incorrectly found that Jefferson County had standing to initiate a cause of action to recover the subject marriage license pursuant to Tenn. Code Ann. § 39-16-504. Mrs. Smith orally raised the issue of whether the County constituted the proper party for the first time at trial.  In her brief, Mrs. Smith relies on the plain language of Tenn. Code Ann. § 39-16-504, which states:

(a) It is unlawful for any person to:

(1) Knowingly make a false entry in, or false alteration of, a governmental record;

(2) Make, present, or use any record, document or thing with knowledge of its falsity and with intent that it will be taken as a genuine governmental record; or

(3) Intentionally and unlawfully destroy, conceal, remove or otherwise impair

-7-

the verity, legibility or availability of a governmental record.

(b) A violation of this section is a Class A misdemeanor.

**(c)(1)** *Upon notification from any public official having custody of government records, including those created by municipal, county or state government agencies, that records have been unlawfully removed from a government records office, appropriate legal action may be taken by the city attorney, county attorney or attorney general, as the case may be, to obtain a warrant for possession of any public records which have been unlawfully transferred or removed in violation of this section.*

(2) The records shall be returned to the office of origin immediately after safeguards are established to prevent further recurrence of unlawful transfer or removal.

Tenn. Code Ann. § 39-16-504 (2010).

Relying upon the foregoing emphasized statutory language, Mrs. Smith argues that Jefferson County brought the present action, instead of the county attorney, in contravention of the "clear language of the statute," and as a result, the trial court erred in not dismissing Jefferson County's complaint. The first issue raised on appeal is therefore a question of statutory construction. To resolve this issue, our task is to interpret Tenn. Code Ann. § 39-16-504(c)(1) to determine whether Jefferson County is a proper party to this lawsuit under the meaning of the statutory provision.

The Supreme Court of Tennessee has recapitulated the primary principles of statutory construction as follows:

[T]here are a number of principles of statutory construction, among which is the most basic rule of statutory construction: to ascertain and give effect to the intention and purpose of the legislature. However, the court must ascertain the intent without unduly restricting or expanding the statute's coverage beyond its intended scope. The legislative intent and purpose are to be ascertained primarily from the natural and ordinary meaning of the statutory language, without a forced or subtle interpretation that would limit or extend the statute's application.

*Mooney v. Sneed*, 30 S.W.3d 304, 306 (Tenn. 2000) (citations and internal quotation marks omitted).

In articulating the basic principles of statutory interpretation, our Supreme Court also has stated that the courts are not permitted "to alter or amend a statute." *Gleaves v. Checker Cab Transit Corp., Inc.*, 15 S.W.3d 799, 803 (Tenn. 2000). "The reasonableness of a statute may not be questioned by a court, and a court may not substitute its own policy judgments for those of the legislature." *Mooney*, 30 S.W.3d at 306 (citing *Gleaves*, 15 S.W.3d at 803). "It is presumed that the Legislature in enacting [a] statute did not intend an absurdity, and such a result will be avoided if the terms of the statute admit of it by a reasonable construction." *Epstein v. State*, 366 S.W.2d 914, 918 (Tenn. 1963). Finally, "courts must 'presume that the legislature says in a statute what it means and means in a statute what it says there.'" *Gleaves*, 15 S.W.3d at 803 (quoting *BellSouth Telecomm., Inc. v. Greer*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997)).

In the instant case, Mrs. Smith contends that the plain language of Tenn. Code Ann. § 39-16-504(c)(1) unambiguously states that the county attorney—not Jefferson County itself—is the proper party to the present lawsuit. We reject Mrs. Smith's argument to limit the application of § 39-16-504(c)(1). When the aforementioned principles of statutory construction are applied to the language of Tenn. Code Ann. § 39-16-504(c)(1), we conclude that the more reasonable construction is that the provision merely authorizes the city attorney, county attorney, or attorney general to pursue legal action in order "to obtain a warrant for possession of any public records which have been unlawfully transferred or removed . . . ." Tenn. Code Ann. § 39-16-504(c)(1). Clearly, the phrase—"appropriate legal action may be taken by the city attorney, county attorney or attorney general"—does not mandate that counsel for a governmental entity be designated the real party in interest under circumstances where a county or city seeks to recover possession of their own property. We agree with Jefferson County when it stated in its brief that "[t]o require counsel for [governmental] entities to become the real party in interest, rather than their clients and owners of the affected property, would result in [an] absurdity."

To support her argument, Mrs. Smith relies on Tennessee's ouster statutes, which empower "district attorneys general, county attorneys, and city attorneys, within their respective jurisdictions," to prosecute any public official guilty of misconduct. Tenn. Code Ann. § 8-47-103 (2002). Mrs. Smith's brief specifically cites § 8-47-103, which provides:

> It is the duty of the attorney general and reporter, the district attorneys general, county attorneys, and city attorneys, within their respective jurisdictions, upon notice being received by them in writing that any officer herein mentioned has been guilty of any of the acts, omissions, or offenses set out in § 8-47-101, forthwith to investigate such complaint; and, if upon investigation such person finds that there is reasonable cause for such complaint, such person shall forthwith institute proceedings in the circuit, chancery, or criminal court of the

proper county, to oust such officer from office.

Tenn. Code Ann. § 8-47-103 (2010).

Mrs. Smith's reliance on the ouster statutes is misguided, because such statutes relate to instituting ouster proceedings and are not relevant to her contention that county attorneys are the proper parties in interest in a lawsuit to recover county property. Tennessee's ouster statutes also require that a "petition or complaint shall be in the name of the state and may be filed upon the relation" of the attorney general and reporter, district attorney general, county attorney, or city attorney. Tenn. Code Ann. § 8-47-110. Section 39-16-504, which is at issue in the present case, does not have such a requirement. Similarly, we find *Jordan v. State ex rel. Williams*, 397 S.W.2d 383, 396 (Tenn. 1965), which Mrs. Smith cites in support of her argument, to not be on point.

Finally, Mrs. Smith's assertion that the legislative history of Tenn. Code Ann. § 39-16-504 "makes it clear that the legislature intend[ed] such actions to be brought in the name of the county attorney" is simply erroneous. The legislative debate over House Bill 1935 indicates that the statute was intended to "allow[] the city attorney or county attorney to retrieve public records which are now being sold at flea markets, in shopper magazines[;] it just gives them an avenue to go and retrieve these records and put them in a proper place." This is not the same as requiring that county or city attorneys initiate actions to recover property belonging to a county or city. As Jefferson County points out in its brief, the following excerpts from the legislative debate on HB 1935 support the legislature's intention that "the respective entities are the proper parties to bring suits to recover their documents."

> And I understand what you're saying is that if it's a case of the Historical Commission, a non-profit entity, that owns something, why would they not like any other person who owns property and has somebody take it have a right to replevin it.

> They have rights to recover possession of the property. I think replevins went out a few years ago under the new rules or they're the old rules now, but they were new rules at the time.

In our opinion, Mrs. Smith's interpretation of Tenn. Code Ann. § 39-16-504 represents a strained and narrow construction that is not justified by the legislative history, facts, or the law. This issue, accordingly, lacks merit.

B.

Mrs. Smith further complains that the trial court erred in finding that the Crockett license was a governmental or public record. Section 39-16-504 of the Tennessee Code provides, in relevant part, that it is unlawful for a person to "[i]ntentionally and unlawfully destroy, conceal, remove or otherwise impair the verity, legibility or availability of a governmental record." Tenn. Code Ann. § 39-16-504(a)(3) (2010). In order to resolve the issue, our task is to determine whether the subject marriage license is a governmental record within the meaning of § 39-16-504.

The terms "government" and "governmental record" are defined, in relevant part, in § 39-11-106:

(14) "Government" means the state or any political subdivision of the state, and includes any branch or agency of the state, a county, municipality or other political subdivision;

(15) "Governmental record" means anything:

(A) Belonging to, received or kept by the government for information; or

(B) Required by law to be kept by others for information of the government[.]

Tenn. Code Ann. § 39-11-106(a)(14)-(15) (2010).

Between 1715 and 1820, statutes and laws established uniform rules to be observed in solemnizing the rites of matrimony. As the County quoted in its brief, one statute in particular authorized the county clerk to grant marriage licenses:

*And be it further enacted by the authority aforesaid*, That the clerk of each county is hereby authorised and empowered to grant marriage licences to any person applying for the same, first taking bond, . . . which bond aforesaid shall be taken, and licence granted, by the clerk of the county in which the feme resides, which licence shall be directed to any authorised minister or justice of the peace . . . .[7]

According to the laws in effect in Tennessee in 1815, the proper governmental procedure was for the clerk of the county court to file endorsed marriage licenses that had

---

[7]*Laws of the State of Tennessee, Including Those of North Carolina Now in Force in this State From the Year 1715 to the Year 1820, Inclusive*, Ch. 7, § 3, at 227-28.

been returned in the office of the specified county official:

> BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF TENNESSEE, That where any minister of the Gospel or justice of the peace in this state, shall solemnize the rites of matrimony, it shall be the duty of said minister of the Gospel, or justice of the peace to endorse on the back of said licence, the time of said marriage, and sign his name thereto, and return said licence to the clerk of the county court, within six months thereafter, whose duty it shall be to file said licence in his office, which said licence and certificate shall be considered as competent evidence of the said marriage; any law, usage or custom to the contrary notwithstanding. Oct. 10, 1815.[8]

The above-quoted statutes were in effect in Tennessee around the time when the Crockett license was issued in 1805 and clearly gave the clerk of each Tennessee county the authority to grant marriage licenses. Furthermore, as early as 1815, the county court clerk had a duty to retain all endorsed and returned marriage licenses in the clerk's office. In the present case, the parties do not dispute that the Crockett license indicates on its face that it was issued in Jefferson County, Tennessee, by J. Hamilton, the county court clerk at the time. It is also undisputed that Jefferson County stored and maintained the Crockett license for approximately 125 years until it was purportedly removed from the courthouse in the 1930s or 1940s by Harry Vance, uncle of Mrs. Smith. Jefferson County is clearly a government entity within the meaning of Tenn. Code Ann. § 39-11-106(a)(14). We also conclude that pursuant to § 39-11-106, the Crockett license falls within the ambit of the definition of a governmental record as anything "[b]elonging to, received or kept by the government for information." Tenn. Code Ann. § 39-11-106(a)(15)(A) (2010). We decline to address whether the 1989 statutory definition of a "governmental record" has retroactive effect and is therefore applicable in this case, because the issue was not raised on appeal. Even if the statutory definition does not have retroactive effect, the County clearly maintained the document for many years, and the marriage license met the common law definition of a governmental record, because a public official of Jefferson County, by authority of law, created the Crockett license. Finally, there is no question that, in the words of the trial court, the Crockett license is a "Jefferson County historical document," given the reputation of David Crockett as a 19th-century American folk hero.

Mrs. Smith argues in her brief that Jefferson County did not have a legal duty to issue marriage licenses at the time the Crockett license was issued. Furthermore, citing Acts Passed at The First Session of the Twenty-Second General Assembly of the State of Tennessee 1837-8, she asserts that the County's obligation to issue marriage licenses and

---

[8] *Acts of Tennessee*, 11th General Assembly, 1815, Ch. 47, § 1, at 52.

maintain a record of returned licenses did not exist prior to 1838. However, Mrs. Smith provides no discussion or evidence of what the relevant state of the law was around the time the Crockett license was actually issued and concedes that county clerks had a statutory duty to issue and retain marriage licenses when the subject marriage license was removed from the Jefferson County courthouse in the 1930s or 1940s.

Ms. Hinchey, director of the Jefferson County archives,[9] testified as to the County's archival policy regarding both executed and unexecuted marriage licenses on direct examination.

> Q   And have you reviewed the various marriage documents maintained by Jefferson County in the early 1800s?
>
> A   Yes.
>
> Q   And are you familiar with these records?
>
> A   Yes.
>
> Q   Now, in the 1800s from the records you've been able to review, if a marriage license was issued, it was endorsed and executed and then returned to the clerk. What happened?
>
> A   It was signed by the – by the person initiating and stored by the clerk.
>
> Q   What was the – was there an entry made in the marriage record book?
>
> A   Yes. Yes. The minister would sign the date and sometimes where the marriage took place.
>
> Q   And have you made a copy of a marriage license just by way of example of a marriage license that was issued and executed and returned?
>
> A   Yes.

---

[9] Jefferson County archivist is responsible for organizing, indexing, and storing the original county records.

Q And is this also one you have the original of?

A I have the original. I don't know if we brought that one.[10]

* * *

Q . . . If a license was issued by the clerk and it was not returned, do you know what was – what notation was made in the marriage record book?

A No return.

Q And if a marriage license was actually issued, was not endorsed or executed by a minister and returned to the county clerk, what was done?

(Opposing counsel objected at this point. Trial court overruled objection.)

A Still no return.

Q What was done with the license?

A Oh, it was kept if it was returned back to the clerk.

Q Now, have you made copies of some of the marriage licenses in the early 1800s that were issued by the Jefferson County clerk that were not endorsed and executed but were returned?

A Yes.

The trial testimony of Ms. Hinchey established that Jefferson County had a policy of keeping unexecuted marriage licenses that were returned to the county clerk during the relevant time period. Ms. Hinchey's testimony was confirmed by Mr. Farrar, Jefferson County Clerk, who described the current procedure regarding the issuance and return of unendorsed marriage licenses as being very similar to the protocol followed in the early

---

[10]As an illustration of the type of records kept and maintained by the County during the relevant period (i.e., the early 1800s), Ms. Hinchey presented the marriage license issued to Richard Graves and Casandra Riggs on September 17, 1805, by Joseph Hamilton. The trial judge overruled the objections of opposing counsel as to the relevancy of this testimony, stating that "[i]t just gives me a picture of how they keep records in the clerk's office."

1800s. Mr. Farrar further testified that unexecuted marriage licenses which are returned to his office are "county property." Based on the evidence presented at trial, we do not find Mrs. Smith's reference to the statutes passed by Tennessee's 22nd General Assembly in 1837 to be dispositive that the Crockett license did not constitute a governmental record at the time of its issuance.

Next, Mrs. Smith contends that even if the Jefferson County clerk had a statutory duty to issue marriage licenses at the relevant time period, David Crockett "had no legal duty to return [the license] to the clerk in the event the marriage did not occur." Mrs. Smith, therefore, concludes that the Crockett license cannot be a public or governmental record. Her point is a moot one, however, because the unexecuted Crockett license was, in fact, returned to the county clerk and maintained by the County for approximately 125 years before it was removed in the 1930s or 1940s.

Finally, Mrs. Smith raises a Virginia case in support of her contention that the Crockett license is not the rightful property of the County. In *State of Maine v. Adams*, 672 S.E.2d 862 (Va. 2009), the State of Maine brought an action on behalf of the Town of Wiscasset seeking to quiet title to a printed copy of the Declaration of Independence that was purchased by a Virginia resident. The *Adams* court upheld the circuit court's finding that the printed copy of the Declaration of Independence was not a common law public record. *Adams*, 672 S.E.2d at 862. This case, however, is distinguished from the case at bar, and therefore, Mrs. Smith's reliance on it is completely misplaced. First and foremost, E. Russell, a private printer, was commissioned to print copies of the Declaration in July 1776 for widespread distribution as "broadsides." *Id.* at 864. As the Virginia Supreme Court observed, Russell was a private printer, not an authorized public officer who was executing the duties of public office at the time he printed the broadsides. *Id.* at 867. Second, Maine failed to establish that Wiscasset kept the printed copy as a town record. For the foregoing reasons, the holding in the *Adams* case is neither binding nor persuasive on our decision in the present case.

In view of the trial court's acceptance of Ms. Hinchey's testimony and the fact that the Crockett license was issued by an authorized county court clerk for Jefferson County, we feel compelled to conclude that the trial court did not err in finding the Crockett license to be a governmental record.

C.

The third issue raised by Mrs. Smith is that the trial court erred in finding that the County had met its burden of proof in demonstrating that the Crockett license had been wrongfully removed or converted. We disagree.

We have reviewed the entire record, and it is our conclusion that the preponderance of the evidence weighs in favor of the County's assertion that the Crockett license was wrongfully removed from the Jefferson County courthouse by a relative of Mrs. Smith's and that she has repeatedly and intentionally impaired the availability of the County's document. The record indicates that Mrs. Smith has provided inconsistent accounts of how she came to possess the marriage license at issue. In a letter dated May 15, 1996, to Dr. Muncy, Mrs. Smith stated that she has "had this document in [her] possession since the 1930s, and it has been researched and authenticated." In another account, Mrs. Smith related that her uncle, Harry Vance, who was a "Davy Crockett enthusiast" and Chairman of the Jefferson County Court at the time, had removed the Crockett license from the Jefferson County courthouse when papers were being cleared out to create more space and had given the document to his brother, Paul Vance, father of Mrs. Smith. It was years later, after Paul Vance had passed away, that Mrs. Smith acquired the Crockett license. Finally, Mrs. Smith testified at her deposition that certain documents stored in the Jefferson County courthouse were being discarded and that her father, Paul Vance, took the marriage license because of his interest in Davy Crockett. Because of this inconsistency and the fact that the Vance brothers are deceased, we agree with the trial court in assigning very little probative value to Mrs. Smith's account of how she acquired the Crockett license.

What can be said of the evidence is that the County offered proof showing that at around the time the Crockett license was issued, the County's procedure was to file returned, but unexecuted marriage licenses, in the archives. As Mrs. Smith pointed out in her brief, the County introduced into evidence copies of 39 out of 167 "No Return" licenses, which were issued by the Jefferson County Clerk before, during, and after the relevant year, 1805, and then stored by the County, including two documents of considerably less historical significance than the Crockett license (i.e., a receipt for two fox pelts and a stud horse license). Furthermore, the County maintained the Crockett license in its archives for approximately 125 years prior to the document's removal. Mrs. Smith has offered no evidence to rebut the County's evidence and no evidence from which we may infer a different cause other than wrongful or unlawful conversion as to how the Crockett license ended up in Mrs. Smith's possession.

It is also evident from the record that the County clearly established Mrs. Smith's intention to impair the availability of the Crockett license, an official Jefferson County

document. First, in a letter to Mrs. Smith dated July 25, 1995, Dr. Muncy confirmed her desire not to donate the original Crockett license to the Jefferson County museum. Second, the affidavits of Mr. Farrar and Ms. Hinchey state that when these County officials told Mrs. Smith at their 1999 meeting that the Crockett license rightfully belonged to the County and should be returned, Mrs. Smith flatly refused. Third, when asked at her deposition whether she refused to return the original Crockett license to the County, Mrs. Smith testified, "Yeah. I refuse to return it. It's going to stay in my possession." Mrs. Smith's daughter confirmed her mother's intention to retain the subject license.

Based on the foregoing analysis of the record, the trial court properly determined that the County had carried its burden of proof in showing by a preponderance of the evidence that the Crockett license was more than likely unlawfully removed from the possession of Jefferson County.

D.

Mrs. Smith further asserts that the trial court erred in finding the records maintained by Jefferson County around the early 1800s demonstrated that the County did not abandon or discard any records. In her answer to the complaint, Mrs. Smith raised the affirmative defense that the County abandoned the Crockett license at issue and therefore, forfeited its right to possession.

Abandonment of property is "generally defined as the voluntary relinquishment thereof by its owner or holder, with the intention of terminating his or her ownership, possession, and control, and without vesting ownership in any other person." 1 C.J.S., *Abandonment* § 1 (2011); *see also Hays v. Montague*, 860 S.W.2d 403, 408 (Tenn. Ct. App. 1993). "[T]he burden of proving abandonment is upon the party asserting it. The abandonment must be established by a clear and unequivocal evidence of decisive and conclusive acts." *Jacoway v. Palmer*, 753 S.W.2d 675, 679 (Tenn. Ct. App. 1987). Common law abandonment has two primary elements: the "intention to abandon," which is considered the first and paramount inquiry, and the "external act by which the intention is carried into effect." *Cottrell v. Daniel*, 205 S.W.2d 973, 975 (Tenn. Ct. App. 1947).

In her brief, Mrs. Smith opined at great length about the fact that the County admitted into evidence only 39 of the 167 licenses marked "no return" in the marriage registry book for the relevant time period. As she reasoned, "[t]he County's failure to introduce [the other 'no return' licenses] at trial is evidence that the County discarded them." We disagree. The County's admission into evidence of only a subset of "no return" licenses does not constitute a positive showing by Mrs. Smith of an intention to abandon or discard the Crockett license.

-17-

Mrs. Smith has not carried the burden of proof in affirmatively showing that the County voluntarily intended to abandon or discard the subject license and acted accordingly. In general, "a rebuttable presumption of ownership arises from possession of property." 73 C.J.S. *Property* § 70 (updated June 2011); *see also Induction Technologies, Inc. v. Justus*, 295 S.W.3d 264, 266 (Tenn. Ct. App. 2008). Our review of the record in this case convinces us that there is sufficient evidence to overcome the presumption that Mrs. Smith is the rightful owner of the Crockett license. The County had kept and maintained the Crockett license for approximately 125 years. Additionally, through trial testimony, the County established that it was customary in the early 1800s and is still customary for the county clerk of Jefferson County to keep any returned marriage licenses that have not been endorsed. As counsel for Jefferson County astutely observed, "[i]t defies logic that Jefferson County would keep and store a stud horse license (1859) and fox pelt receipt (1860) but not the marriage license of David Crockett, hero of the Alamo and arguably the greatest frontiersman in United States history." We find no evidence that the County intended to abandon or discard the Crockett license. Mrs. Smith's argument on this issue is denied as moot.


E.


In the fifth issue on appeal, Mrs. Smith contends that the trial court erred in making findings regarding David Crockett and his historical significance which were not based on any evidence admitted at trial but purportedly based on the trial court's personal knowledge. Before we can determine whether the trial court erred in taking judicial notice of Crockett's historical significance and notoriety, we must first turn to Tenn. R. Evid. 201 for guidance.


For a trial court to take judicial notice of an "adjudicative fact" that "fact must be one not subject to reasonable dispute, in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Tenn. R. Evid. 201(b). Furthermore, judicial notice is discretionary and may be taken by the trial court whether requested or not. Tenn. R. Evid. 201(c). As we have stated, judicial notice provides "a method of dispensing with the necessity for taking proof." *Counts v. Bryan*, 182 S.W.3d 288, 291 (Tenn. Ct. App. 2005) (quoting *State ex rel. Schmittou v. City of Nashville*, 345 S.W.2d 874, 883 (Tenn. 1961)). "Judicial notice is generally defined as a judge's utilization of knowledge other than that derived from formal evidentiary proof in the pending case." *Id.* (quoting 1 J. Weinstein & M. Berger, Weinstein's Evidence, note 3, ¶ 200[01] at 200-02 (1991)).


Tenn. R. Evid. 201(a) expressly states that the "rule governs only judicial notice of adjudicative facts." Various sources have endeavored to define what is meant by

"adjudicative facts" as contemplated in Tenn. R. Evid. 201. Generally, judicial notice of adjudicative facts "refers to the recognition of facts that are relevant to a specific lawsuit." *Counts*, 182 S.W.3d at 292 (citing R. Banks, Jr. and E. Collins, *Judicial Notice in Tennessee*, 21 Mem. St. U.L.Rev. 431, 434 (1991)). As another source has explained, "[a]djudicative facts help to 'explain who did what, when, how, and with what motive and intent.'" *Id.* (quoting N. Cohen, S. Sheppeard & D. Paine, Tennessee Law of Evidence § 2.01[3] (4th ed. 2000)). Additionally, trial courts may take notice of adjudicative facts in the form of books and reports, provided that such "facts" are not subject to reasonable dispute pursuant to Tenn. R. Evid. 201(b). *Id.* "Historical facts, such as who, what or when, are more likely to satisfy this [criterion], as distinguished from narrative explanations or opinions, which are more likely to be subject to dispute." *Id.* at 293 (citing 21 Mem. St. U.L.Rev. 431, 433-34)). Tennessee courts have taken judicial notice of a variety of historical facts. *See, e.g., Wood v. Cooper*, 49 Tenn. 441, 1871 WL 3524, at *4 (Tenn. 1870) ("As part of the history of the United States, and of the late civil war, we take judicial notice of the fact that Missouri had representatives in the Provisional Congress of the Confederate States, prior to December, 1861, and was admitted into the Southern Confederacy at the fourth session of the Congress of the Confederate States of America in December, 1861, and had Senators and Representatives in the Congress of the Confederate States until the close of the war . . . ."); *Henly v. Franklin*, 43 Tenn. 472, 1866 WL 1843, at *2 (Tenn. 1866) ("We have never recognized the power of the Confederate States to coin money or issue Treasury notes. But, as a fact it is well known that they did issue Treasury notes, which for a time within the revolted States, served the purposes of money, and exchanged property from hand to hand."); *Poole v. First Nat. Bank of Smyrna*, 196 S.W.2d 563, 571 (Tenn. Ct. App. 1946) ("The facts as to the economic depression in the 1930's are a part of the history of the country of which the courts take judicial notice.").

The issue before us pertains to the trial court taking notice of historical facts, as distinguished from law. In the instant case, the trial court, in its memorandum opinion, made reference on two occasions to historical facts regarding David Crockett and his historical significance. First, the trial judge noted seeing "a statue of Davy Crockett in the middle of the courthouse square" recently in a West Tennessee county. Second, the court concluded that Paul and Harry Vance "had plenty [of] time to know the status of Davy Crockett in history" when the Crockett license was removed in the 1930s or 1940s, because Crockett "had been a congressman for that district," and after that, he "went to the Alamo and lost his life." "So he was already a historical figure 125 years later." The judicially noticed facts that David Crockett served as a congressman from the 12th congressional district in West Tennessee and was killed at the Battle of the Alamo are undisputed and readily verified by checking reliable, accurate sources of history. Therefore, the requirements for judicial notice of an "adjudicative fact" under Tenn. R. Evid. 201(b) are met in this instance.

Questioning the historical prominence of David Crockett around the time the license was taken, Mrs. Smith argues in her brief that Crockett was "largely forgotten" by the late 19th century but his legend was reborn when Walt Disney made a 1950s television series about the Tennessean. Assuming arguendo that Mrs. Smith is correct, she has stated in the record that her uncle, Harry Vance, was an "admirer of David Crockett" and a "David Crockett enthusiast" and that her father, Paul Vance, had an interest in David Crockett. Based on her own admission, the two individuals primarily responsible for removing the subject marriage license from the Jefferson County courthouse in the 1930s or 1940s were certainly aware of David Crockett and most likely recognized his historical significance. Accordingly, we reject this issue as lacking merit.

F.

Next, Mrs. Smith argues the trial court erred in refusing to consider the recorded recollection of Mrs. Smith given on the television program, Antiques Roadshow, or from her letters to Jefferson County officials as evidence of the manner in which she acquired ownership of the Crockett license, because they fall within several hearsay exceptions. In her brief, Mrs. Smith argues that the trial court should have allowed the interview transcript from the Antiques Roadshow episode of January 9, 2006, to be read into evidence as a "recorded recollection" of Mrs. Smith's knowledge of how she acquired the Crockett license.

Testimony based on hearsay is inadmissible in trial proceedings unless it falls within one of the recognized exceptions to the hearsay rule. Tenn. R. Evid. 802; *Mitchell v. Archibald*, 971 S.W.2d 25, 28 (Tenn. Ct. App. 1998). Mrs. Smith claims that the Antiques Roadshow transcript was admissible under the recorded recollections exception to hearsay rule provided in Tenn. R. Evid. 803(5), which states:

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

Tenn. R. Evid. 803(5).

As we have articulated, "[t]o utilize Tenn. R. Evid. 803(5)'s recorded recollection exception, a party must (1) provide a memorandum or record; (2) about a matter that the witness once had knowledge of; (3) establish that the witness now has insufficient

-20-

recollection to testify fully and accurately; (4) that the statement was made or adopted by the witness; (5) while fresh in the witness's memory; and (6) that the record accurately reflects the witness's knowledge." *Mitchell*, 971 S.W.2d at 28. However, "[a] trial court is given considerable latitude in the admission of evidence and will be reversed only for an abuse of discretion." *Aussenberg v. Kramer*, 944 S.W.2d 367, 370 (Tenn. Ct. App. 1996) (citing *Steele v. Ft. Sanders Anesthesia Group, P.C.*, 897 S.W.2d 270, 275 (Tenn. Ct. App. 1994)).

Mrs. Smith contends on appeal that the videotape and transcript of the Antiques Roadshow episode in question demonstrates that the matter of how she acquired the Crockett license was fresh in her mind. Mrs. Smith further asserts that she could not fully and adequately recall the circumstances connected with her acquisition of the license when she was deposed less than four years later because of her advanced age and health. In response, the County argues that Mrs. Smith failed to satisfy every element required for utilization of Rule 803(5)'s exception. For instance, Mrs. Smith did not establish that the recorded recollection was an accurate account of those facts that were still fresh in her memory. She did not "review and authenticate the interview," nor did she establish that the interview given for the Antiques Roadshow correctly reflected her knowledge of how she came to possess the license. Furthermore, as the County points out, Mrs. Smith's counsel neither requested at trial that the recorded interview be read into evidence nor made an offer of proof in accordance with Tenn. R. Evid. 103(a)(2).

Next, Mrs. Smith argues that the Antiques Roadshow interview qualified as a statement of personal and family history pursuant to Tenn. R. Evid. 804(b)(4). Prior statements of personal family history are admissible as evidence if a declarant is unavailable as a witness within the meaning of Rule 804(a). Due to Mrs. Smith's advanced age at the time of this trial and her daughter's testimony concerning her mother's physical infirmities, we do not question that the witness unavailability requirement was met under Rule 804(a)(4) in the present case.[11] That being said, we do not find that Mrs. Smith's Antiques Roadshow account of how she acquired the Crockett license constitutes a statement about declarant's own birth, adoption, marriage, divorce, legitimacy, relationships, ancestry, or other similar fact of personal or family history within the meaning of Rule 804(b)(4).

Based on the record as a whole, we cannot conclude that the trial court abused its discretion in refusing to admit the interview transcript of Mrs. Smith's appearance on Antiques Roadshow. Accordingly, we affirm the trial court's decision not to consider the transcript at issue.

---

[11]Rule 804(a)(4) provides that unavailability of a witness includes situations in which the declarant "[i]s unable to be present or to testify at the hearing because of the declarant's death or then existing physical or mental illness or infirmity." Tenn. R. Evid. 804(a)(4).

## G.

In the seventh issue on appeal, Mrs. Smith challenges the facial constitutionality of Tenn. Code Ann. § 39-16-504 on grounds that its retroactive application "seeks to take property from [private citizens] who lawfully possess the property without just compensation," despite the fact that she had not questioned the constitutional validity of the statute in the trial court. The Attorney General was notified of this challenge and filed his own brief on this issue, concluding that Mrs. Smith has waived the constitutionality issue by raising it for the first time on appeal and that we need not reach the constitutional issue in light of the other issues raised on appeal.

"It has long been the general rule that questions not raised in the trial court will not be entertained on appeal and this rule applies to an attempt to make a constitutional attack upon the validity of a statute for the first time on appeal unless the statute involved is so obviously unconstitutional on its face as to obviate the necessity for any discussion." *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983). Because the constitutional validity of a statute was not presented in the trial proceedings, "no opportunity was afforded for the introduction of evidence which might be material and pertinent in considering the validity of the statute." *Id.*

Careful review of the record indicates that Mrs. Smith failed to challenge the constitutionality of the statute in question at any time in the trial court proceedings, so the issue was neither presented nor decided. As Mrs. Smith's issue of the constitutional validity of § 39-16-504 was not properly raised in the trial court, it has effectively been waived for full consideration on appeal.

## H.

Mrs. Smith further argues that the trial court improperly permitted the testimony of Jefferson County archivist, Ms. Hinchey. Specifically, Mrs. Smith complains that Ms. Hinchey's testimony on how the Jefferson County clerk prepared and recorded documents in the early 1800s was inadmissible, because it was not based on her personal knowledge. The testimony in question was derived from Ms. Hinchey's review of the different types of extant documents issued, registered, stored, and carefully preserved by the County since its inception in 1792.

"It is well settled that, when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses and

their manner and demeanor while testifying is in a far better position than this Court to decide those issues." *Cumberland Properties, LLC v. Ravenwood Club, Inc.*, No. M2010-01814-COA-R3-CV, 2011 WL 1303375, at *14 (Tenn. Ct. App. W.S., Apr. 05, 2011); *see also McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). "The weight, faith, and credit to be given the witnesses' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." *Whitaker*, 957 S.W.2d at 837.

In the instant case, Ms. Hinchey testified that she had served as Director of the Jefferson County Archives since 1996 and was certified as an archives manager by the State of Tennessee. Her responsibilities include organizing, indexing, and storing original county documents and training staff in these procedures. As Mrs. Smith stated in her brief, "Ms. Hinchey was certainly qualified to testify as to what the records show, but she was repeatedly asked, over the objection of [Mrs. Smith's counsel], and testified as to what the clerk would or would not do." Mrs. Smith contends that Ms. Hinchey's "testimony in this regard was not based on her own personal knowledge and should have been excluded under Rule 602, Tenn. R. Evid."[12] However, Rule 703, upon which Rule 602 is subject, provides, in part, that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." Tenn. R. Evid. 703. As Mrs. Smith admits in her brief, Ms. Hinchey was eminently qualified to testify as to what the collection of Jefferson County records show, and this includes any inference or professional opinion on the official policy or procedure followed by the County in the early 1800s with regards to the issuance, recordation, storage, and maintenance of unexecuted but returned marriage licenses. The county clerk's procedure during the relevant time is indicated by the types of official documents issued and recorded during that period and still maintained by the County to this day. Although the trial court did not make a specific finding as to the weight and credit accorded to Ms. Hinchey's testimony, we conclude that, to the extent that the trial court was aided in its judgment by the testimony at issue, no error or abuse of discretion was committed. The trial court was in the best position to determine Ms. Hinchey's credibility and demeanor. We therefore find that the trial court properly considered Ms. Hinchey's testimony at trial.

---

[12]Tenn R. Evid. 602 provides: "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony. This rule is subject to the provisions of Rule 703 relating to opinion testimony by expert witnesses."

I.

Lastly, Mrs. Smith asserts that the trial court erred in ordering her to immediately return the Crockett license, notwithstanding her timely notice of appeal, and additionally subjecting her to a monetary penalty for civil contempt.

"The power to punish for contempt has long been regarded as essential to the protection and existence of the courts and the proper administration of justice." *Konvalinka v. Chattanooga-Hamilton Cty. Hosp. Authority*, 249 S.W.3d 346, 354 (Tenn. 2008). This contempt power vested in Tennessee courts is now purely statutory. *See* Tenn. Code Ann. § 29-9-101 et seq.; *see also Konvalinka*, 249 S.W.3d at 354. Of particular relevance to the case at bar, the scope of the courts' contempt power extends to circumstances involving "[t]he willful disobedience or resistance of any officer of the such courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of such court." Tenn. Code Ann. § 29-9-102(3) (2000). The Tennessee Supreme Court has enumerated four essential elements of civil contempt claims based upon an alleged disobedience of a court order: (1) "the order alleged to have been violated must be 'lawful;'" (2) "the order alleged to have been violated must be clear, specific, and unambiguous;" (3) "the person alleged to have violated the order must have actually disobeyed or otherwise resisted the order;" and (4) "the person's violation of the order must be 'willful.'" *Konvalinka*, 249 S.W.3d at 354-55. In any contempt proceeding, the threshold question is whether the court order that was allegedly violated is "lawful." *Id.* at 355. "A lawful order is one issued by a court with jurisdiction over both the subject matter of the case and the parties." *Id.*

In the present case, it is undisputed that the Jefferson County Circuit Court had jurisdiction over both the subject matter and parties of this lawsuit. On November 24, 2009, the trial court entered a final judgment on this matter, requiring the immediate return of the Crockett license to the County. Mrs. Smith filed a notice of appeal on December 21, 2009, but she neither returned the Crockett license nor filed a motion to stay the court's order. In accordance with Tenn. R. Civ. P. 62.01,[13] the County did not seek to enforce the trial court's judgment until January 4, 2010, when it filed its Motion for Order Enforcing Judgment for Specific Act and for Contempt. On February 1, 2010, the trial court entered an order granting the County's motion and requiring Mrs. Smith to surrender the Crockett license on or before February 7, 2010, or face a fine of $500 per day. Mrs. Smith failed to return the document by the court-ordered deadline and did not file her Motion to Stay Order and Set

---

[13]Rule 62.01 provides in relevant part: "Except as otherwise provided in this rule, no execution shall issue upon a judgment, nor shall proceedings be taken for its enforcement until the expiration of 30 days after its entry." Tenn. R. Civ. P. 62.01.

Bond until February 12, 2010. Mrs. Smith finally delivered the marriage license at issue to the court on February 19, 2010. On March 1, 2010, the trial court granted Mrs. Smith's motion to stay but left the fine established by the February 1 order in effect, resulting in a total penalty amount of $6,000 for the twelve days that she was in contempt. In her brief, Mrs. Smith argues that the trial court's sanction was an abuse of its discretion and caused Mrs. Smith to suffer injustice. We disagree.

The record before us reveals that the trial court's order entered on February 1, 2010, was lawful in that the trial court had jurisdiction over both the subject matter of the case and the parties. Furthermore, we find that the order in question "expressly and precisely spell[ed] out the details of compliance in a way that [would] enable reasonable persons to know exactly what actions are required or forbidden." *Konvalinka*, 249 S.W.3d at 355. The order therefore was clear, specific, and unambiguous. We also find that the record clearly indicates that Mrs. Smith violated the trial court's order by not returning the Crockett license to the court until February 19, 2010—twelve days after the trial court's order requiring her to surrender the document on or before February 7 or face monetary sanctions. Finally, in her brief, Mrs. Smith offers no evidence that convinces us that her conduct in violating the court order was anything other than intentional and voluntary; therefore, we must conclude that she willfully violated the order.

Because Mrs. Smith willfully violated a lawful and sufficiently clear and precise order, we find that the trial court did not abuse its discretion in holding her in civil contempt and in sanctioning her with a daily fine. However, we do find the penalty of $500 per day to be excessive and in contravention of Tenn. Code Ann. § 29-9-103(b), which limits fines for the punishment for contempt to fifty dollars ($50). Therefore, punishment for this contempt is modified to $50 per day for the twelve days that Mrs. Smith was in contempt for a total of $600, in accordance with Tenn. Code Ann. § 29-9-104.

## V. CONCLUSION

The judgment of the trial court is affirmed, modified only in regard to the fine. The matter is remanded for further proceedings consistent with this opinion.

_____
JOHN W. McCLARTY, JUDGE

-25-